## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JL Powell LLC and JL Powell Clothing LLC, | |
| Plaintiffs/Counterdefendants, | |
| v. | Docket No. 2:13-cv-00160-NT |
| Joshua L. Powell, individually and d/b/a The Field, The Field Outfitting, and The Field Outfitting Company, | |
| Defendant/Counterplaintiff. | |

## COUNTERPLAINTIFF JOSHUA L. POWELL'S MOTION FOR
## PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Counterplaintiff Joshua L. Powell ("Mr. Powell"), moves the Court to enter a Preliminary Injunction against Counterdefendants JL Powell LLC and JL Powell Clothing LLC.  Mr. Powell seeks to enjoin Counterdefendants by ordering that they refrain from further use of Mr. Powell's name, endorsement, or signature to suggest that Mr. Powell is a personal spokesperson, promoter, or endorser of J.L. Powell.  The grounds for this relief are set forth in the memorandum below.

## MEMORANDUM OF LAW

The facts supporting Mr. Powell's requests for preliminary injunctive relief are set forth below and in the accompanying Declaration of Joshua L. Powell. (Ex. 1)  In summary, this motion arises from (i) the Counterdefendants' disregard of Mr. Powell's July 11, 2013 letter notifying Counterdefendants that they may no longer use his publicity rights ("Termination Notice") and (ii) Counterdefendant JL Powell Clothing LLC's improper use of Mr. Powell's publicity rights by fabricating a false personal message from Mr. Powell in the most recent JL Powell catalog.

As the Court may recall, Mr. Willard, Chairman of JL Powell LLC and JL Powell Clothing LLC, testified that Counterdefendants discontinued any past use of Mr. Powell's personal messages in its catalog "post-Josh" (*i.e.* after Mr. Powell left the company). (June 13, 2013 Hrg. Tr. at 205:8-13, 206:22-207:15)  Following the last hearing, on July 11, 2013, Mr. Powell, through his counsel, sent the Termination Notice to Mr. Willard's attention making it abundantly clear that the rights granted under Section 7.1(b) of the Contribution Agreement were terminated.  Mr. Powell also advised that "continued use of any of the rights granted under Section 7.1(b) shall be considered a violation of Mr. Powell's publicity and/or privacy rights."

After receiving the Termination Notice, Counterdefendants not only reinstated their past practice of using Mr. Powell's publicity rights, but did so in an incredibly false and misleading manner.  Specifically, JL Powell Clothing LLC issued its "Fall 2013" catalog containing a new personal message that purports to be written by Mr. Powell to JL Powell's customers.  As set forth below, the personal message begins with "For me, 50 miles an hour is the perfect speed …," discusses articles of clothing that "we design," and ends with Mr. Powell's distinctive, handwritten signature:

1



As set forth in the Declaration of Joshua L. Powell, he neither authored or approved this message, and he did not approve or participate in the design of JL Powell's clothing.

JL Powell Clothing LLC, a company that was impermissibly assigned Mr. Powell's publicity rights without his consent, apparently believes that Mr. Powell's Termination Notice is a nullity, and that it can forever force Mr. Powell to be an unpaid, indentured servant of the company – in violation of the Thirteenth Amendment – by ascribing his signature to personal messages that he neither authored nor approved, for the benefit of JL Powell and to the detriment of Mr. Powell.  Accordingly, Counterdefendants, individually and jointly, are attempting to mislead the public into believing that Mr. Powell is the primary spokesperson, promoter, co-designer, and endorser for JL Powell, a company that directly competes with Mr. Powell's own company, the Field.

2

## BACKGROUND

**A.      Blue Highway's Equity Investment In JL Powell**

Counterdefendants erroneously assert in this action that Mr. Powell "sold" his "naming rights" for "consideration" in connection with "an acquisition and merger transaction." (*See* Pls.' Mem. in Opp'n to Def.'s Mot. for Leave to Suppl. R. on Pls.' Mot. for Prelim. Inj. at 1 (ECF No. 64))  Nothing could be further from the truth.  There was no "acquisition and merger transaction" giving rise to the Contribution Agreement, and Mr. Powell did not "sell" his naming rights – or anything else – to Counterdefendants.   As set forth below, Mr. Powell granted a gratuitous license to use his publicity rights in connection with an equity investment.

The Contribution Agreement reflects a contribution of capital made by an investor named Blue Highways Holdings LLC ("Blue Highways"). (*See* Powell Decl. ¶ 4)  Blue Highways, a sophisticated investor, wished to invest capital in Mr. Powell's company JL Powell Inc., which it valued at $4.3 million. (Powell Decl. ¶ 2)  Instead of investing directly in Mr. Powell's existing company, Blue Highways "contributed" $2.5 million to a new entity, JL Powell LLC, in exchange for a 57% "Class A" interest in JL Powell LLC, and JL Powell Inc. transferred all its assets to the new entity in exchange for a 43% "Class B" interest in JL Powell LLC. (Powell Decl. ¶ 4)  ***Mr. Powell, the founder of JL Powell, was not paid any portion of the contribution capital paid under the Contribution Agreement****. (Powell Decl. ¶ 4)

**B.      Mr. Powell's Grant Under The Contribution Agreement**

Mr. Powell was not a named party to the Contribution Agreement between Blue Highways and JL Powell Inc. (Powell Decl. ¶ 5)  Mr. Powell, however, did sign the Contribution Agreement in a limited capacity as to Section 7.1(b). (*Id.*)   In Section 7.1(b), Mr. Powell personally agreed to grant JL Powell LLC the exclusive right, license and permission to use his name and endorsement:

> In connection with this Agreement and the transfer and assignment by [JL Powell Inc.] of all [JL Powell Inc.'s intellectual property] to [JL Powell LLC], Joshua L. Powell (the "Founder") hereby grants to [JL Powell LLC] throughout the world the sole and exclusive ***right, license, and permission to use his name and endorsement*** to exploit, turn to account, advertise, and otherwise profit from [JL Powell LLC's] goods and services bearing such name, image, and/or endorsement. The grant made hereunder shall be exclusive to [JL Powell LLC], and the Founder agrees that he shall not, on behalf of himself or any other person or entity, grant any similar right of any kind in connection with any business competitive in any respect with [JL Powell LLC] or any of its affiliates and/or subsidiaries.

(*Id.*)  As set forth above, Section 7.1(b) does not expressly state that the grant is perpetual or irrevocable, and there is no defined term for the grant. (*See id.*)  ***Again, Counterdefendants did not pay Mr. Powell any money or any other consideration in connection with the grant in Section 7.1(b).*** (Powell Decl. ¶ 7)

## C.     JL Powell LLC Assigns Mr. Powell's Grant Without His Consent and the Consent of His Company.

After Mr. Powell was fired from JL Powell LLC, the Board members of JL Powell LLC (who were all members of Blue Highways) agreed to transfer all of the company's assets to Plaintiff JL Powell Clothing LLC, a new entity created by Blue Highways, in satisfaction of a loan made by Blue Highways to JL Powell LLC of approximately $1.4 million.[1] (Powell Decl. ¶ 17)  ***Again, no money was paid to Mr. Powell in connection with this transfer***. (*Id.*)  JL Powell LLC assigned its rights under the Contribution Agreement to JL Powell Clothing LLC, including Mr. Powell's grant in Section 7.1(b), without the written consent of Mr. Powell's company, JL Powell Inc. (Powell Decl. ¶ 18)  Because the grant included obligations personal to Mr. Powell, the assignment also required Mr. Powell's consent.

---

[1] In other words, Blue Highway's members effectuated a transfer of a business they valued at $4.3 million to satisfy a loan of $1.4 million.

4

**D.      Mr. Powell Sends a Termination Notice to JL Powell LLC**

On July 11, 2013, Mr. Powell sent the Termination Notice to JL Powell LLC c/o Blue Highway (as required under the notice provisions of the Contribution Agreement), attention Bruce Willard, notifying the parties that he was terminating the grant in Section 7.1(b) of the Contribution Agreement. (Powell Decl. ¶ 19)

The Termination Notice explained that any grant in Section 7.1(b) of the Contribution Agreement was superseded by the subsequent Employment Agreement, Amended and Restated Employment Agreement, and Separation Agreement entered into by Mr. Powell and JL Powell LLC in 2010, 2011 and 2012, respectfully, and advised the parties that the publicity rights he granted personally under Section 7.1(b) were assigned without Mr. Powell's consent. (Powell Decl. ¶ 20)  The Termination Notice also noted that the Counterdefendants had ceased to use any reference to Mr. Powell's name, image, or likeness in the J.L. Powell catalog. (*Id.*)  But in an abundance of caution, Mr. Powell sent the Termination Notice as "written notice of termination of Section 7.1(b) of the Contribution Agreement." (*Id.* (emphasis in original))

The Termination Notice indicated that the grant in Section 7.1(b) was terminable at will because it did not specify a fixed term of duration. (*Id.*)  The Termination Notice also indicated that any "continued use of any of the rights granted under Section 7.1(b) shall be considered a violation of Mr. Powell's publicity and/or privacy rights." (*Id.*)

**E.      JL Powell Clothing LLC's Unauthorized Use of Mr. Powell's Endorsement**

After being put on notice of Mr. Powell's unequivocal termination of any rights granted to it, JL Powell Clothing LLC continued to use Mr. Powell's personal endorsement in its catalogs.  For example, on August 26, 2013, Mr. Powell discovered that the Fall 2013 JL Powell catalog includes a personal message with Mr. Powell's signature below it. (Powell Decl. ¶ 21) The message is reproduced below:

5



(*Id.*)   The personal message begins with "For <u>me</u>, 50 miles an hour is a perfect speed …," discusses pieces of clothing that "<u>we</u> design," and ends with Mr. Powell's distinctive, handwritten signature. (Powell Decl. ¶ 21)   Mr. Powell did not authorize JL Powell Clothing LLC to use his signature in the catalog. (Powell Decl. ¶ 22)   Mr. Powell did not author the message, nor did he authorize the use of his name or signature. (*Id.*)   More importantly, Mr. Powell did not participate in "designing" the clothing in the Fall 2013 Catalog. (*Id.*)   On information and belief, JL Powell Clothing LLC printed and mailed the catalog after Mr. Powell sent the Termination Notice. (*Id.*)

## LEGAL STANDARD

A district court may grant a preliminary injunction "when it concludes that the plaintiff has demonstrated (1) that it will suffer irreparable injury if the injunction is not granted; (2) that

any such injury outweighs any harm which granting the injunction would cause the defendant; (3) a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Equine Technologies, Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 544 (1st Cir. 1995).

## ARGUMENT

Mr. Powell is entitled to preliminary injunctive relief because Counterdefendants have no present right to Mr. Powell's publicity rights.  Mr. Powell seeks an injunction ordering that Counterdefendants refrain from using Mr. Powell's name, endorsement, or signature to suggest that Mr. Powell is employed by J.L. Powell, designing clothing for J.L. Powell, or acting as a spokesperson for J.L. Powell.

### I.    Mr. Powell Will Suffer Irreparable Harm If An Injunction Is Not Granted.

The likelihood that "consumers will be confused as to a product's source or sponsorship provides a 'potent basis for a finding of irremediable injury.'" *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 927 F. Supp. 528, 535 (D. Mass. 1996) (quoting *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699-700 (1st Cir. 1987)); *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2d Cir. 1986) ("[E]stablishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm.").  "When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic." *Id.* at 42.

Counterdefendants' wrongful acts have created the false impression that Mr. Powell continues to be affiliated with and personally endorses the Counterdefendants' catalog business, and even participates in the design of their clothing.  Their use of the first person ("me"), use of the term "we," and the use of Mr. Powell's distinctive, handwritten signature constitute a false endorsement because Mr. Powell never spoke or wrote the words attributed to him in the J.L.

Powell catalog.  Counterdefendants' unauthorized use of Mr. Powell's name and endorsement falsely suggests that Mr. Powell is still employed by J.L. Powell, participates in the design of its clothing, and is speaking on behalf of the company. (*See* Powell Decl. ¶ 23)

Mr. Powell is irreparably harmed by the Counterdefendants' wrongful acts.  His company, The Field, directly competes with J.L. Powell.  By falsely suggesting that Mr. Powell endorses and participates in the design of their competing products, Counterdefendants are confusing the public.  Mr. Powell's reputation is irreparably harmed by the improper application of his endorsement and signature to personal messages he did not write or approve. (Powell Decl. ¶ 26)  Further, his new business, The Field, is irreparably harmed by the Counterdefendants' actions, which falsely associate Mr. Powell with his old company, rather than his new company. (*See* Powell Decl. ¶¶ 25-26)

Indeed, as Counterdefendants pointed out in the Amended Complaint, while Mr. Powell was still associated with the company, the J.L. Powell catalog often "offered personal messages from [Mr. Powell] to its customers, many of which were followed by his signature." (Am. Compl. ¶ 11 (ECF No. 39))  By continuing to use Mr. Powell's signature following what appears to be a personal message from Mr. Powell, Counterdefendants are attempting to create the impression that Mr. Powell has not left the company and is still writing personal messages to customers, is still participating in the selection and design of their clothing products, and is still endorsing the company.  In fact, Mr. Powell has already received calls and e-mails from recipients of the newest J.L. Powell catalog who have been misled into believing that Mr. Powell had authored and signed the personal note in the catalog. (Powell Decl. ¶ 24)  These e-mails and calls demonstrate that customers are already being confused by Counterdefendants' misleading use of Mr. Powell's signature and the intentional similarity between the new, false message and

the real messages from Mr. Powell previously included in the J.L. Powell catalog. Counterdefendants' continued use of Mr. Powell's identical signature in manner which identifies Mr. Powell as an individual misleads the public and creates confusion, to the detriment of Mr. Powell's reputation and to the detriment of his new company.

## II. The Continuing Injury To Mr. Powell In The Absence Of The Requested Injunction Outweighs Any Injury To The Counterdefendants From The Entry Of An Injunction.

In the reverse situation, where the Counterdefendants asserted that Mr. Powell's catalog contained allegedly infringing material, Counterdefendants contended that Mr. Powell would suffer "little or no injury" if the Court barred Mr. Powell from distributing the allegedly infringing catalogs and quarantining all remaining copies of the catalogs. (Pl.'s Mot. for TRO & Prelim. Inj. with Incorporated Mem. of Law at 17 (ECF No. 3))  It would be disingenuous for them to now claim a heavy burden from essentially identical relief, particularly given the relative size and wealth of the parties. (*See* Powell Decl. ¶¶ 1, 3) Moreover, Counterdefendants have demonstrated that they do not need to use Mr. Powell's endorsement or signature in their catalogs, as they discontinued use of Mr. Powell's image and signature shortly after he was terminated from the company.

## III. Mr. Powell Will Likely Succeed On The Merits.

Mr. Powell is likely to prevail for at least three reasons.  First, the grants and restrictions in Section 7.1(b), which involve personal services by and the personal publicity rights of Mr. Powell, were not assignable without the consent of both Mr. Powell and his company.  Second, Mr. Powell's obligations in Section 7.1(b) were superseded by the Separation Agreement.[2]

---

[2] The attendant restrictions in Section 7.1(b) were also superseded by the Employment Agreement, Amended and Restated Employment Agreement, and Separation Agreement entered into by Mr. Powell and JL Powell LLC.  Mr. Powell in no way abandons this position by focusing solely on the grants under Section 7.1(b).

Third, to the extent any publicity rights still existed, Mr. Powell unequivocally terminated any such rights with the Termination Notice.

There can be no circumstances where Mr. Powell is <u>forever</u> required to personally endorse and promote a company for which he no longer works, particularly where he is not provided any compensation, and allow a company to create personal messages from him that he did not author or approve.  For the Court to hold otherwise would place Mr. Powell in involuntary servitude, in violation of the Thirteenth Amendment. *See, e.g.*, *Gov't Guarantee Fund of Repub. of Finland v. Hyatt Corp*, 95 F.3d 291, 303 (3d Cir. 1996) (noting that "courts are loathe to order specific performance of personal services contracts" because to do so "would … run contrary to the Thirteenth Amendment's prohibition against involuntary servitude"); *Read v. Wilmington Senior Ctr., Inc.*, No. C.A. 12586, 1992 WL 296870, at *1 (Del. Ch. Sept. 16, 1992) ("[C]ourts of equity historically have refused to order an individual to perform a contract for personal services [and] will not, under the guise of awarding specific performance, compel involuntary servitude...."); *see also* Calamari & Perillo, Contracts § 16–5 at 666 (3d ed. 1987) (citing *People v. Lavender*, 48 N.Y.2d 334, 422 N.Y.S.2d 924, 398 N.E.2d 530 (1979)).

Moreover, underlying the nondelegable nature of these contracts is the notion that courts will refuse to order specific performance where it would be inherently difficult to do so. *In re Noonan*, 17 B.R. 793, 798 (Bankr. S.D.N.Y. 1982) (citing *De Rivafinoli v. Corsetti*, 4 Paige Ch. 263, 270 (N.Y. Ch. 1833) (disagreeing with the adage that "a bird that can sing and will not sing, must be made to sing")).

A.    **Mr. Powell's Publicity Rights Are Not Freely Assignable.**

Under Delaware law, contracts involving "obligations of a personal nature" generally cannot be assigned. *FinanceAmerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, 380 A.2d 1377, 1380 (Del. Super. 1977); *see also* 29 Williston on Contracts § 74:10 (4th ed.) (noting the

10

general rule that "contract[s] involv[ing] obligations of a personal nature" may not be assigned). Section 7.1(b) involves obligations of a personal nature.  As in past issues of the J.L. Powell Catalog, which are set forth in the record, it permitted JL Powell LLC to use Mr. Powell's name and personal endorsement, including personal messages from Mr. Powell himself.  Section 7.1(b) also contained personal restrictions on Mr. Powell's ability to use his name in connection with competing businesses.

Counterdefendants cannot credibly assert otherwise.  This is particularly so where JL Powell Clothing LLC recently used Section 7.1(b) to create a "personal" message bearing Mr. Powell's handwritten signature and discussing the clothing that he purportedly "designs" with the company.  Because Counterdefendants assert that they can forever make Mr. Powell an involuntary spokesperson and promoter of JL Powell, and simultaneously restrict him from promoting any competing business, they cannot characterize Section 7.1(b) as anything other than containing obligations of a personal nature.

Counterdefendants assert that Mr. Powell's company, JL Powell Inc. signed a "Bill of Sale" that permitted JL Powell LLC the unfettered right to transfer of Mr. Powell's rights under the Contribution Agreement.  This assertion is grossly misplaced for three reasons.  First, the Contribution expressly states that the rights under the Contribution Agreement may not be assigned without the consent of Mr. Powell's company, JL Powell Inc. (Contribution Agreement § 12.8)  Second, because the rights were granted by Mr. Powell personally, and involve his personal endorsement, his individual consent was also required.  Third, Counterdefendants are misstating the Bill of Sale.  The Bill of Sale states only that JL Powell LLC "may assign (without consent) any of its rights under the *Bill of Sale*," not the *Contribution Agreement*.  The Bill of Sale itself does not address or even mention the rights and restrictions granted by Mr. Powell.

11

As such, JL Powell LLC's unilateral ability to assign its rights under the "Bill of Sale" is irrelevant to whether it could assign the personal obligations of Mr. Powell under an entirely different agreement.

Nor can Counterdefendants claim that Section 7.1(b) did not require assignment to JL Powell Clothing LLC because the provision includes "affiliates."  First, the grant of Mr. Powell's publicity rights does not expressly extend to any affiliates.  Second, the term "affiliates" set forth in the restrictive covenant does not expressly include "future" affiliates.  As set forth above, the Separation Agreement between JL Powell LLC and Mr. Powell includes express references to "past, present and future" parties, while the term "affiliates" in Section 7.1(b) of the Contribution Agreement does not.   Under the standard canon of contract construction *expressio unius est exclusio alterius*, that is, that the expression of one thing implies the exclusion of the other, potential future affiliates are excluded from the definition of affiliates in Section 7.1(b).  "Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed." *Ellington v. EMI Mills Music, Inc.*, 959 N.Y.S.2d 88 (N.Y. Sup. Ct. 2011); *see also VKK Corp. v. National Football League*, 244 F.3d 114, 130-31 (2d Cir. 2001) ("The NFL and its member clubs are sophisticated commercial actors who could have specifically referred to future member clubs had they intended to include them in the Release.  The Release refers to 'past, present, and future ... Releasors' but makes no mention of future 'Releasees,' leading us to conclude that the parties to the Release did not intend to include future member clubs."); *see also Seidensticker v. Gasparillia Inn, Inc.*, No. 2555-CC, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) (applying *expressio unius* to exclude successors because one section of contract referred to

"Seidensticker, or his ... personal representative or successor" and another section referred to "Seidensticker" alone).

**B.     JL Powell LLC's Right To Mr. Powell's Publicity And Endorsement Rights Was Superseded By The Separation Agreement.**

On April 2, 2012, JL Powell LLC terminated Mr. Powell's employment.  In connection with the termination of his employment and in exchange for receiving severance payments from JL Powell LLC, Mr. Powell entered into a Separation Agreement and Release with JL Powell LLC dated April 2, 2012 (the "Separation Agreement").  The Separation Agreement states that Mr. Powell "is no longer an officer, employee or agent of the Company, "may not act on behalf of the Company," and "may not bind the Company."  Section 6(f) of the Separation Agreement states: "[Mr. Powell] acknowledges that the making, execution and delivery of this Release has been induced by no promises, representations, statements, warranties or agreements other than those expressed herein. [Mr. Powell] understands it supersedes all prior discussions and agreements between the Executive and the Company or any representative or affiliate of the Company, whether oral or in writing."  Pursuant to Paragraph 16, the Separation Agreement supersedes all prior written agreements between the parties with respect to its subject matter.

Under the terms of the Separation Agreement, JL Powell LLC understood that as of April 2, 2013, Mr. Powell had no further obligations to act as an "agent" for JL Powell LLC or act "on behalf of" JL Powell LLC.  The Separation Agreement does not preserve the provision the Contribution Agreement requiring Mr. Powell to continue to promote and act as a "co-designer" for JL Powell LLC.  Thus, Section 7.1(b) was superseded by the Separation Agreement.

**C.     Section 7.1(b) Was Properly Terminated.**

It is undisputed that Section 7.1(b) has no stated duration.  As such, it is terminable at will.  "Contracts for an indefinite period are terminable at will by either party upon giving

reasonable notice to the other party." 17A Am. Jur. 2d Contracts § 466 (updated Aug. 2013); *see also* 17B C.J.S. *Contracts* § 602 (updated 2013) ("An agreement without a fixed term of duration generally is terminable at the will of either contracting party.... If there is nothing in the nature or the language of a contract for an indefinite period to indicate that it is perpetual, the courts will interpret the contract to be terminable at will."); 1 Williston on Contracts § 4:22 (4th ed. updated 2013) ("[A] promise contemplating continuing performance for an indefinite time is to be interpreted as stipulating only for performance terminable at the will of either party."); 5-24 Corbin on Contracts § 24.29 (updated 2013) ("In a large proportion of cases, when the parties did not specify the duration of their contracts, the courts have concluded that these contracts should be terminable at the will of either party, often upon reasonable notice.").

"Delaware appears to follow that general law." *Del. Fin. Mgmt. Corp. v. Vickers*, No. Civ. A. 96C-10-032, 1999 WL 458633, at *7 (Del. Super. June 9, 1999).  Several Delaware courts in a variety of contexts have held that contracts without a fixed term of duration are terminable at the will of either party. *See, e.g.*, *id.* at *7 (applying this "general law" to services contract); *A.R. Dervaes Co. v. Houdaille Indus., Inc.*, 1981 WL 7625, 7 Del. J. Corp. L. 173, 179-80 (Del. Ch. Sept. 29, 1981) (applying this "accepted judicial approach" to franchise distributorship contract).  Mr. Powell has found no Delaware case repudiating the well-settled rule that a contract without a fixed term is terminable at will by either party.  This is particularly true where, as here, the agreement is for personal obligations. *N. Del. Indus. Dev. Corp. v. E. W. Bliss Co.*, 245 A.2d 431, 433 (Del. Ch. 1968) (recognizing that "performance of a contract for personal services, even of a unique nature, will not be affirmatively and directly enforced").

Likewise, courts across the country hold that agreements conferring a license to use an intellectual property right such as a name or a trademark without a stated duration are

terminable-at-will by the licensor. *See Trace Minerals Research, L.C. v. Mineral Resources Int'l, Inc.*, 505 F. Supp. 2d 1233, 1241 (D. Utah 2007) ("A license containing no time frame is generally terminable at will."); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) (same); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 19-20 & n.1 (E.D.N.Y. 1994) ("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor.") (citing Corbin on Contracts § 96); *see also Butkus v. Downtown Athletic Club of Orlando, Inc.*, No. CV 07-2507, 2008 WL 2557427, at *6 (C.D. Cal. 2008) (suggesting that celebrity athlete had right to terminate at will license to use his name on award, but declining to decide the issue because of factual disputes regarding scope of license).  Because the intellectual property rights licensed in Section 7.1(b) do not contain a term of duration, they were terminable at will by Mr. Powell and he terminated them with the Termination Notice.  Thus, Counterdefendants have no right to continue to use Mr. Powell's signature and endorsement under the Contribution Agreement or otherwise.

Counterdefendants attempt to distinguish these cases, but begrudgingly concede that a gratuitous license for no consideration is terminable at will. (ECF No. 64 at 6, 8 (citing *Dial-A-Mattress*, 847 F. Supp. 2d at 19; *Butkus*, 2008 WL 2557427, at *6)   Despite the Counterdefendants' bald assertions, they fail to identify *any* consideration Mr. Powell received for the personal rights and restrictions he provided in the Contribution Agreement.[3] This is not surprising, because no such consideration is stated in the Contribution Agreement.  Indeed, in the end, Mr. Powell did not receive a red cent for his company. (Powell Decl. ¶¶ 4, 7, 17)  Moreover, under Delaware law, "When consideration is lacking, there was never a contract at all."  *Haft v.*

---

[3] Indeed, Mr. Powell signed the Contribution Agreement in his personal capacity "solely for purposes of Section 7.1(b)" and that Section does not grant Mr. Powell any consideration for the use of his publicity rights or refer to any other Section of the Contribution Agreement that does.

*Dart Grp. Corp.*, 841 F. Supp. 549, 573 (D. Del. 1993) (citing *Hensel v. U.S. Elecs. Corp.*, 262 A.2d 648, 651 (Del. 1970)); *see also Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 220 (3d Cir. 2002) (holding that confidentiality agreement was not enforceable because the plain language of the agreement was silent as to consideration given in return for confidentiality obligation). Thus, not only is Section 7.1(b) terminable at will, it was never enforceable to begin with.

In addition, Mr. Powell had the right to terminate Section 7.1(b) because JL Powell LLC materially breached the Contribution Agreement when it improperly attempted to assign its rights to JL Powell Clothing LLC.  "[A] material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement." *Rano v. Sipa Press, Inc.* 987 F.2d 580, 586 (9th Cir. 1993).

Further, the Counterdefendants abandoned these publicity rights when they ceased to use messages from Mr. Powell, images of Mr. Powell, and his signature in the J.L. Powell catalog. Under Delaware law, "a contract remains in force until and unless it has been terminated according to its terms or by actions of the parties.  Abandonment, however, may constitute one of those actions." *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 572 (D. Del. 1993) (citing *Artesian Water Co. v. State Dep't of Highways & Transp.*, 330 A.2d 441, 443 (Del. 1974)).

Finally, the Counterdefendants' wrongful use of Mr. Powell's signature to suggest that the new personal message was written and signed by Mr. Powell exceeds the scope of the publicity rights that the Counterdefendants once had.  The personal message wrongfully attributed to Mr. Powell goes far beyond just his name and endorsement, instead creating a false association between Mr. Powell and J.L. Powell by suggesting that he is he is designing clothing for the J.L. Powell catalog and that he approves of the clothing and other items in the catalog.

Even if Section 7.1(b) had not been superseded or terminated, it did not give the Counterdefendants the right to fabricate a personal message that suggests that Mr. Powell is still designing and approving clothing for the J.L. Powell catalog and falsely attribute that message to Mr. Powell.

> **D.     JL Powell Clothing LLC's Appropriation Of Mr. Powell's Name And Endorsement Without Mr. Powell's Permission Violates Mr. Powell's Right Of Publicity.**

Under Michigan law[4], an individual establishes a violation of a right of publicity upon demonstrating: (1) a pecuniary interest in his identity, and (2) that his identity has been commercially exploited by the defendant. *Parks v. LaFace Records*, 329 F.3d 437, 460 (6th Cir. 2003) (holding that Rosa Parks satisfied both prongs of the test because she had used her name in the past for promotional purposes, and because music group Outkast used her name to sell records).

First, Mr. Powell is able to establish a pecuniary interest in his identity because he has used his identity in the past for promotional purposes. In fact, JL Powell Clothing LLC admits in pleadings already made of record with this Court that Mr. Powell "served as the sole model for [the former] catalog" and "[t]he catalog also offered personal messages to customers from Defendant Powell, many of which were followed by his 'J.L. Powell' signature." (*See* Willard Decl. ¶ 4 (ECF No. 3-1)) Moreover, the defendant's act of misappropriating the plaintiff's identify is sufficient evidence of its commercial value. *Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 778 (W.D. Mich. 2008) (noting that plaintiff need not be a celebrity to assert the right of publicity claim).

---

[4] Choice of law theory in right of publicity cases is an unsettled area of law, but courts often agree that the state of residence or domicile of the individual asserting the right presents a proper choice for governing law. *See generally Bi-Rite Enters., Inc. v. Bruce Miner Co.*, 757 F.2d 440 (1st Cir. 1985); McCarthy's *The Rights of Publicity and Privacy* § 11:8. Mr. Powell currently resides in Michigan.

The second prong is satisfied because Mr. Powell's identity is now being commercially exploited by JL Powell Clothing LLC through the personal message in the J.L. Powell Fall 2013 catalog which has been fabricated to appear as if written and signed by Mr. Powell. (Powell Decl. ¶¶ 21-22)  This unauthorized use of Mr. Powell's name and endorsement falsely suggests that he is still employed by J.L. Powell, that he participates in the design of its clothing, and that he is actively promoting the company. (Powell Decl. ¶ 23)  The wrongful misappropriation of Mr. Powell's identity in the foregoing manner is precisely the type of conduct that should be enjoined under Michigan law. *See, e.g.*, *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 827 (6th Cir. 2005) (preliminary injunction entered where defendant used, without Andretti's permission, a quote from Andretti praising defendant's product).

**E.     JL Powell Clothing LLC's Misleading Appropriation Of Mr. Powell's Name And Endorsement Constitutes False Endorsement Under Section 43(a) Of The Lanham Act.**

Section 43(a) of the Lanham Act provides in pertinent part that "[a]ny person who, on or in connection with any goods or services ... uses in commerce ... any ... false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1).  Courts have readily recognized false endorsement or association claims under § 43(a) of the Lanham Act where a celebrity's image or persona is used in association with a product so as to imply that the celebrity endorses the product. *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915, 925-926 (6th Cir. 2003)*.*  However, the plaintiff need not prove celebrity to maintain this claim, as false endorsement occurs when an

individual's identity is used in connection with a product or service in such a way that consumers are likely to be misled about the individual's sponsorship or approval of the product or service. *Id.*; *see also Hauf,* 547 F. Supp. 2d at 777 (noting that plaintiff under a 43(a) claim for false endorsement need not be a celebrity).

As discussed above, the commercial value of Mr. Powell's identity is admitted by JL Powell Clothing LLC.  JL Powell Clothing LLC willfully used the commercial value of Mr. Powell's identity, by appropriating Mr. Powell's name and endorsement, to falsely suggest that Mr. Powell is still employed by J.L. Powell, that he participates in the design of its clothing, and that he is actively promoting the company.  Because the message in the catalog is completely fabricated and presented in a manner to suggest that Mr. Powell wrote and signed it, one must presume that consumers will actually be confused into believing that Mr. Powell authored the message and that he was speaking on behalf of JL Powell Clothing LLC and its products when he did so. (Powell Decl. ¶¶ 21-22)  In fact, Mr. Powell has already received phone calls and e-mails demonstrating such confusion. (Powell Decl. ¶ 24)   In addition, because it is being misrepresented to the public that Mr. Powel co-designs and approves JL Powell Clothing LLC's products, he is in jeopardy of losing investors in his competing business, which operates under The Field brand. (Powell Decl. ¶ 25)

JL Powell Clothing LLC cannot defend its use of Mr. Powell's name and endorsement complained of herein as a legitimate exercise of its asserted trademarks.  Rather than making a trademark use, JL Powell Clothing LLC's use identities Mr. Powell *in his individual capacity*, using indicia of personal identity, such as Mr. Powell's own signature, coupled with a personal message that uses language like "For me" and "we."  This use, which is false and misleads the

public, is conduct that the Lanham Trademark Act protects consumers against rather than condones. *See* 15 U.S.C. § 1125(a)(1).

## IV.     The Public Interest Will Not Be Adversely Affected If The Requested Injunction Is Granted.

Entry of the requested injunction will not adversely affect the public interest. To the contrary, the requested injunction will advance the public interest because it will remove a false endorsement from the market and prevent customers from mistakenly believing that Mr. Powell is personally endorsing and participating in the design of Counterdefendants' products.

## CONCLUSION

Wherefore, Mr. Powell respectfully requests that this Court grant his Motion for Preliminary Injunction against Counterdefendants. Specifically, Mr. Powell requests an order:

a.      enjoining JL Powell LLC and JL Powell Clothing LLC, and their agents, servants, employees, attorneys, successors, assigns and consignees, and all those acting under their authority or in concert or privity with them, from making any further mailing of their sales catalog, known as "J.L. Powell," unless and until they first ensure that the following changes are made: removal of the name, endorsement and/or signature, of "Josh Powell," "J. Powell," "Joshua L. Powell," and in particular removal of the signature "J.L. Powell" that appears on page 3 of the Fall 2013 J.L. Powell catalog, and if there are printed copies that cannot be modified, then such copies shall be quarantined or destroyed; and

b.      enjoining JL Powell LLC and JL Powell Clothing LLC from using the name, endorsement and/or signature of "Josh Powell," "J. Powell," or any other iteration of Mr. Powell's name to identify Mr. Powell as an individual spokesperson or a person speaking on behalf of the Plaintiffs, and shall refrain from falsely attributing content to Mr. Powell, whether in paper or digital on-line versions, or on their commercial website at www.jlpowell.com.

Dated: September 10, 2013                 Respectfully submitted,

Joshua L. Powell

By: _____ /s/ Joseph Collins _____     By: _____ /s/ Benjamin Piper _____
One of his attorneys                         One of his attorneys

Joseph Collins (admitted *pro hac vice*)        Timothy Bryant
Gina Durham (admitted *pro hac vice*)         Benjamin Piper
DLA Piper LLP (US)                         Preti, Flaherty, Beliveau & Pachios LLP
203 North La Salle Street, Suite 1900        One City Center
Chicago, IL 60601                           Portland, ME 04101
312.368.4000                               207.791.3000
joseph.collins@dlapiper.com             tbryant@preti.com
gina.durham@dlapiper.com               bpiper@preti.com

## CERTIFICATE OF SERVICE

I, Joseph Collins, attorney for Defendant Joshua L. Powell, individually and d/b/a The Field Outfitting Company, hereby certify that on the above date, I electronically filed the foregoing document in this matter with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to the registered participants:

Nicole L. Bradick
Richard L. O'Meara
Thomas C. Newman
Murray Plumb & Murray
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
207-773-5651
nbradick@mpmlaw.com
romeara@mpmlaw.com
tnewman@mpmlaw.com

*Attorneys for Plaintiff JL Powell*
*Clothing LLC*



/s/ Joseph Collins
Joseph Collins