Exhibit 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

JL Powell LLC and JL Powell Clothing LLC,

               Plaintiffs/Counterdefendants,

     v.

Joshua L. Powell, individually and d/b/a The
Field, The Field Outfitting, and The Field
Outfitting Company,

             Defendant/Counterplaintiff.

Docket No. 2:13-cv-00160-NT

## DECLARATION OF JOSHUA L. POWELL

Pursuant to 28 U.S.C. § 1746, Joshua L. Powell states as follows:

1.      I am president of The Field, a retail clothing business located in Michigan that has five employees.  I provide this declaration under oath in connection with my motion for preliminary injunction.

2.      Prior to The Field, I was president of a retail company named JL Powell Inc.  In 2010, an investor named Blue Highways Holdings LLC ("Blue Highways"), a Santa Barbara-based company which creates, acquires and operates lifestyle apparel businesses in the direct marketing – catalog & internet – category, wished to invest capital in my company, which it valued at $4.3 million.

3.      Bruce Willard is the founder and chairman of Blue Highways.  He was CEO and owner of The Territory Ahead, an outdoor lifestyle catalog, from 189 until 1998 when sales approached $100 million and he sold the business to Cornerstone Brands.  In 2002, he partnered with Robert Redford on the Sundance Catalog, strengthening the business and growing it to sales of approximately $75 million before selling it to ACI Capital in 2004.  He also acquired Athleta,

a women's sports lifestyle catalog based in Northern California, re-branded the business and quadrupled its sales to just under $100 million. In 2008, he sold Athleta to The Gap, Inc.

4.      Instead of investing directly in my existing company, JL Powell Inc., Blue Highways "contributed" $2.5 million to a new entity, JL Powell LLC, in exchange for a 57% "Class A" interest in JL Powell LLC. In turn, my company, JL Powell Inc., transferred all of its assets to the new entity, including the trademark rights to "J.L. Powell," in exchange for a 43% "Class B" interest in JL Powell LLC. I was not personally paid any portion of the contribution capital in connection with this transaction.

5.      The transaction was memorialized in a Contribution Agreement between Blue Highways and JL Powell Inc. A copy of the Contribution Agreement is attached as Exhibit A. I was not a named party to the Contribution Agreement, and I did not personally participate in the drafting of the Contribution Agreement, but I did sign the Contribution Agreement in a personal capacity as to Section 7.1(b). In Section 7.1(b), I personally agreed to grant the new entity, JL Powell LLC, the exclusive right, license and permission to use my "name" and "endorsement":

> In connection with this Agreement and the transfer and assignment by [JL Powell Inc.] of all [JL Powell Inc.'s intellectual property] to [JL Powell LLC], Joshua L. Powell (the "Founder") hereby grants to [JL Powell LLC] throughout the world the sole and exclusive right, license, and permission to use his name and endorsement to exploit, turn to account, advertise, and otherwise profit from [JL Powell LLC's] goods and services bearing such name, image, and/or endorsement. The grant made hereunder shall be exclusive to [JL Powell LLC], and the Founder agrees that he shall not, on behalf of himself or any other person or entity, grant any similar right of any kind in connection with any business competitive in any respect with [JL Powell LLC] or any of its affiliates and/or subsidiaries.

6.      I also agreed in Section 7.1(b) not to use my name or permit another party to use my name in connection with a business competitive with JL Powell LLC or any of its affiliates and/or subsidiaries:

> The Founder further agrees that he will not use his name or permit any other person or entity to use his name, and otherwise will not assert any right to use his name, including but not limited to any right to use his name under the doctrine of fair use, in connection with any business competitive in any respect to [JL Powell LLC] or any of its affiliates and/or subsidiaries.

I understood "affiliates and/or subsidiaries" to mean JL Powell LLC's then-existing affiliates and subsidiaries.

7.      I was not paid any money or any other consideration in connection with my personal obligations under Section 7.1(b) of the Contribution Agreement.

8.      On March 10, 2010, I entered into an Employment Agreement with JL Powell LLC.  A copy of the Employment Agreement is attached as Exhibit B.  In Section 5 of the Employment Agreement, I agreed that "[d]uring the term of his employment hereunder, and for a period of one year following such termination [], [I] shall not enter into Direct Competition with the Company."  "Direct Competition" is defined in the Employment Agreement as "directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engaging in or owning or holding any ownership interest in or assisting any person or entity engaged in the Business."  The "Business" was defined in the Employment Agreement as "the direct-to-consumer business of selling men's apparel to customers via catalog or internet."  Section 7 further states that the Employment Agreement is "the entire agreement of the parties with respect to the matters addressed herein and supersede any other prior oral or written agreements, arrangements or understandings between [me] and [JL Powell LLC]."

9.      On November 1, 2011, I entered into an Amended and Restated Employment Agreement ("EA") with JL Powell LLC.  A copy of the EA is attached as Exhibit C.  In Section 5 of the EA, as in the Employment Agreement, I agreed that "[d]uring the term of his employment hereunder, and for a period of one year following such termination[], [I] shall not enter into Direct Competition with the Company."  "Direct Competition" is defined in the EA as

3

"directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engaging in or owning or holding any ownership interest in or assisting any person or entity engaged in the Business."  The "Business" was defined in the EA as "the direct-to-consumer business of selling men's apparel to customers via catalog or internet."  Section 7 further states that the EA is "the entire agreement of the parties with respect to the matters addressed herein and supersede any other prior oral or written agreements, arrangements or understandings between [me] and [JL Powell LLC]."  I understood that the restrictive covenants in the EA superseded the restrictive covenant in Section 7.1(b) of the Contribution Agreement.

10.     On April 2, 2012, JL Powell LLC terminated my employment.  In connection with the termination of my employment and in exchange for receiving severance payments from JL Powell LLC, I entered into a Separation Agreement and Release with JL Powell LLC dated April 2, 2012 (the "Separation Agreement").  A copy of the Separation Agreement is attached as Exhibit D.  The Separation Agreement states that I am "no longer an officer, employee or agent of the Company," "may not act on behalf of the Company," and "may not bind the Company."  I understood this to mean that I was no longer required to promote, advertise, or endorse JL Powell LLC in any regard.

11.     In Section 4(b) of the Separation Agreement I represent that I "ha[ve] not engaged in competition in violation of, or otherwise violated either the EA or the JL Powell LLC Proprietary Information and Inventions Agreement executed by [me] on March 8, 2010 (the "IP Agreement") and [I have] no current intention to violate any provision of the EA or the IP Agreement."  I made no similar representation regarding the Contribution Agreement.

12.     Under Paragraph 5(c) of the Separation Agreement, I agreed that my "obligations under Sections 4 and 5 (the "Restrictive Covenants") of the EA, and [my] continuing obligations under the IP Agreement, shall remain in full force and effect, and shall be fully enforceable in accordance with the terms and conditions of the EA or the IP Agreement, as applicable, following [my] termination of employment with the Company and [my] execution of this Agreement. By signing this Agreement, [I] (i) recognize[], acknowledge[] and agree[] that [I] ha[ve] carefully read and fully understand[] the Restrictive Covenants in the EA and the IP Agreement and remain[] fully responsible and liable for complying with the Restrictive Covenants in the EA and the IP Agreement."  JL Powell LLC did not ask or require me to read Section 7.1(b) of the Contribution Agreement or agree to remain responsible and liable for complying with its terms.

13.     Section 6(f) of the Separation Agreement states: "[I] acknowledge[] that the making, execution and delivery of this Release has been induced by no promises, representations, statements, warranties or agreements other than those expressed herein. [I] understand it supersedes all prior discussions and agreements between [me] and the Company or any representative or affiliate of the Company, whether oral or in writing."

14.     Pursuant to Paragraph 16 of the Separation Agreement, that agreement supersedes all prior written agreements between the parties with respect to its subject matter, except for certain restrictive covenants in the EA with JL Powell LLC (which superseded the restrictive covenants in the Contribution Agreement) and other agreements that I entered into with JL Powell LLC "regarding confidentiality, non-disclosure of information or property, non-competition or non-solicitation."  I understood this to mean that my obligations under the Contribution Agreement were of no further force and effect.

15.     Under the terms of the Separation Agreement, I understood that after the expiration of one year, I was free to directly compete with JL Powell LLC without restriction, and no longer had any relationship, affiliation or continuing obligations to JL Powell LLC other than certain confidentiality and other obligations set forth in the Separation Agreement.

16.     In the Separation Agreement, I agreed to provide a release to JL Powell LLC "and its parents, subsidiaries and affiliates, and each of its and their past, present and future officers, directors, members, servants, employees, attorneys, insurers, successors, independent contractors, consultants and assigns."   Unlike the restrictive covenant in the Contribution Agreement, I granted rights to certain of JL Powell LLC's "future" parties.

17.     In January of 2013, several months after I was fired from JL Powell LLC, the Board members of JL Powell LLC (who were all members of Blue Highways) agreed to transfer all of the company's assets to a new entity created by Blue Highways, *i.e.*, JL Powell Clothing LLC, in satisfaction of a loan made by Blue Highways to JL Powell LLC of approximately $1.4 million.  Again, I was paid no money in connection with this bulk transfer.  In sum, I was not paid anything for the assets of the company that I founded and contributed to JL Powell LLC.

18.     I understand that JL Powell LLC assigned its rights under the Contribution Agreement to JL Powell Clothing LLC, including my obligations under Section 7.1(b), without my written consent or the written consent of my company, JL Powell Inc.  I would not have consented, and would have advised the parties that my obligations under Section 7.1(b) were no longer in force and effect.

19.     On July 11, 2013, my counsel sent a Termination Notice to JL Powell LLC c/o Blue Highway (as required under the notice provisions of the Contribution Agreement), attention Bruce Willard, notifying the parties on my behalf that I was terminating the grants in Section

7.1(b) of the Contribution Agreement.  A copy of the Termination Notice is attached as Exhibit E.

20.     The Termination Notice explained that that any grant in Section 7.1(b) of the Contribution Agreement was superseded by the subsequent Employment Agreement, EA, and Separation Agreement entered into by me and JL Powell LLC in 2010, 2011 and 2012, respectively, and advised the parties that the publicity rights I granted personally under Section 7.1(b) were improperly assigned without my consent.  The Termination Notice also noted that the Counterdefendants had ceased to use any reference to my name, image, or likeness in the J.L. Powell catalog.  But in an abundance of caution, I sent the Termination Notice as "written notice of termination of Section 7.1(b) of the Contribution Agreement." (emphasis in original).  The Termination Notice indicated that the grant in Section 7.1(b) was terminable at will because it did not specify a fixed term of duration.  The Termination Notice also indicated that any "continued use of any of the rights granted under Section 7.1(b) shall be considered a violation of Mr. Powell's publicity and/or privacy rights."

21.     On August 26, 2013, I discovered that the Fall 2013 J.L. Powell catalog includes a personal message with my signature below it. A copy of the catalog page containing the message is attached as Exhibit F.    The message is reproduced below:



The personal message begins with "For me, 50 miles an hour is a perfect speed …," discusses pieces of clothing that "we design," and ends with my handwritten signature.

22.     I did not authorize JL Powell Clothing LLC to use my signature in the catalog.  I did not author the message, nor did I authorize the content of the personal message.  Moreover, I did not participate in "designing" the clothing in the Fall 2013 Catalog.  On information and belief, JL Powell Clothing LLC printed and mailed the catalog after my counsel sent the Termination Notice.

23.     This unauthorized use of my name and endorsement falsely suggests that I am still employed by J.L. Powell, that I participate in the design of its clothing, and that I am actively promoting the company.

24.     I have received phone calls and e-mails from recipients of JL Powell Clothing LLC's Fall 2013 Catalog who have been misled into believing that I had authored and signed the personal note in the Catalog.

25.     I have been irreparably harmed by these wrongful acts.  My new company, The Field, directly competes with J.L. Powell.  These acts have put me in jeopardy of losing investors in The Field, who have expressed concern about my name being used in connection with a competing business, and such continued unauthorized use of my name and endorsement will prevent future investment opportunities.  Such lost opportunities could impact my ongoing operations.

26.     My reputation is irreparably harmed by the improper application of my endorsement and signature to personal messages that I did not write or approve.  It is being misrepresented to the public that I co-design and approve my competitor's products.  I do not participate in the selection and design of my competitor's products, and I have no desire to endorse my competitor's products.  I no longer wish to be personally affiliated with J.L. Powell in any regard, and I should be free to promote and endorse The Field without interference.


I declare under the penalty of perjury that the foregoing statements are true and correct.


Dated: September 10, 2013                    /s/ Joshua L. Powell