## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JL POWELL CLOTHING LLC and )
JL POWELL LLC, )
    )
               Plaintiffs, )
    )
v. )
    )
JOSHUA L. POWELL, ) Civil No. 2:13-CV-00160-NT
*Individually and doing business as* )
THE FIELD, *doing business as* )
FIELD OUTFITTING, *doing business* )
*as* FIELD OUTFITTING COMPANY, )
    )
               Defendant. )

## ORDER ON PARTIES' COMPETING MOTIONS
## FOR PRELIMINARY INJUNCTION AND ON DEFENDANT'S
## MOTION TO SUPPLEMENT THE RECORD

This case comes before the Court on the parties' competing motions for preliminary injunction pursuant to Federal Rule of Civil Procedure 65. (ECF Nos. 3 and 66). Also before the Court is the Defendant's motion to supplement the record. (ECF No. 59). For the reasons that follow, the Court GRANTS the Defendant's motion to supplement the record and GRANTS IN PART and DENIES IN PART both parties' motions for injunctive relief.

# FACTUAL BACKGROUND[1]

This case requires the Court to sort the rights and duties of former business partners who parted ways and who now compete with one another in the same line of business. In 2006, Joshua L. Powell ("**Powell**" or the "**Defendant**") began selling high-end men's sportswear and accessories through the J.L. Powell catalog. Powell was the catalog's sole model, and most catalog issues contained a personal message from Powell signed by Powell. In 2007, Powell began seeking out investors for his company, JL Powell Inc. ("**JLP**"). In 2010, a group of investors formed Blue Highways III LLC ("**Blue Highways**") to invest in and acquire JLP.

The acquisition was accomplished in two steps. First, Blue Highways contributed $2.5 million to a new entity, JL Powell LLC, a Delaware limited liability company, of which it was the sole member. Second, JLP contributed all of its assets to JL Powell LLC pursuant to two agreements – a Contribution Agreement, Pls.' Ex. 42,[2] (the "**Contribution Agreement**"), and a Bill of Sale and Assignment Agreement, Pls.' Ex. 44, (the "**Bill of Sale**"). In exchange for JLP's contribution of assets, JLP received a 43% interest in JL Powell LLC. Contribution Agreement § 3.2.

The assets JLP conveyed included intellectual property, defined to include, among other things, "trade names, trade marks, service marks, [and] logos." Bill of

---

[1]     The names in this case are confusingly similar. The Court will refer to the Plaintiffs by their full names: JL Powell Clothing LLC and JL Powell LLC. The Defendant, Joshua L. Powell, will be referred to as "Powell" or the "Defendant." Powell's former company, JL Powell Inc. will be referred to as JLP.  The catalog – once distributed by JLP and now distributed by JL Powell Clothing LLC – will be referred to as "J.L. Powell."

[2]     The Plaintiffs' exhibits were admitted in hard copy into evidence at the June 13, 2013 hearing on the Plaintiffs' motion for preliminary injunction. *See* Ct. Ex. List (ECF No. 53).

Sale § 1 and Contribution Agreement § 4.10(a). The Bill of Sale allows JL Powell LLC to assign its rights, interests, and obligations under that agreement without JLP's consent if the transfer is made to an "Affiliate" or "to any successor to all or substantially all of its business (whether by sale of ownership interests or assets, merger, consolidation or otherwise)." Bill of Sale § 6.

In addition to the transfer of JLP's property to JL Powell LLC under the Bill of Sale, Powell personally conveyed the right to use his name and endorsement to JL Powell LLC, and agreed not to use or convey the right to use his name and endorsement in any business competitive with JL Powell LLC:

> In connection with this Agreement and the transfer and assignment by JLP of all JLP Intellectual Property to [JL Powell LLC], Joshua L. Powell, (the "***Founder***") hereby grants to [JL Powell LLC] throughout the world the sole and exclusive right, license, and permission to use his name and endorsement to exploit, turn to account, advertise, and otherwise profit from [JL Powell LLC's] goods and services bearing such name, image, and/or endorsement. The grant made hereunder shall be exclusive to [JL Powell LLC], and the Founder agrees that he shall not, on behalf of himself or any other person or entity, grant any similar right of any kind in connection with any business competitive in any respect with [JL Powell LLC] or any of its affiliates and/or subsidiaries. The Founder further agrees that he will not use his name or permit any other person or entity to use his name, and otherwise will not assert any right to use his name, including but not limited to any right to use his name under the doctrine of fair use, in connection with any business competitive in any respect to [JL Powell LLC] or any of its affiliates and/or subsidiaries.

Contribution Agreement § 7.1(b). In contrast to the Bill of Sale, the Contribution Agreement prohibits JL Powell LLC from assigning its rights, interest, and obligations under that agreement without JLP's written consent. Contribution Agreement § 12.8. The Contribution Agreement was signed by "J. L. Powell" both in

his capacity as President of JLP and also in his personal capacity "[s]olely for purposes of Section 7.1(b)." Contribution Agreement Signature Page.

Following the acquisition, Powell agreed to stay on as JL Powell LLC's CEO and signed an employment agreement. Def.'s Answer, Ex. A (ECF No. 63-1) (the "**March 10, 2010 Employment Agreement**"). The March 10, 2010 Employment Agreement contained a section dealing with intellectual property and a section governing Powell's agreement not to compete during the term of his employment and for one year following any termination. It also had an integration clause which provided that that agreement "along with the C Unit Agreement and the Operating Agreement collectively embody the entire agreement of the parties with respect to the matters addressed herein and supersede any other prior oral or written agreements, arrangements or understandings between the Executive and the Company."[3] March 10, 2010 Employment Agreement ¶ 7. On November 1, 2011, Powell entered into a second employment agreement with JL Powell LLC, also containing covenants involving intellectual property and non-competition and an integration clause. Def.'s Answer, Ex. B (ECF No. 63-2) (the "**Amended Employment Agreement**").

In May of 2010, JL Powell LLC filed applications with the United States Patent and Trademark Office ("**U.S.P.T.O.**") to register the marks "J.L. Powell" and "The Sporting Life." Powell signed a consent and authorization to the registration of

---

[3]      Neither the C Unit Agreement nor the Operating Agreement have been filed with the Court.

the "J.L. Powell" mark. Pls.' Ex. 46. The marks were registered on January 11, 2011, and April 5, 2011, respectively. Pls.' Exs. 45, 47.

Several times following the acquisition, JL Powell LLC needed additional capital, and turned to Blue Highways. In October of 2010, July of 2011, and August of 2012, Blue Highways loaned JL Powell LLC a total of $1.4 million, secured by JL Powell LLC's assets. Pls.' Exs. 60-66. JL Powell LLC defaulted on these loans. In January of 2013, Blue Highways accepted all of JL Powell LLC's assets in full satisfaction of its debts, and then Blue Highways contributed all of the assets to JL Powell Clothing LLC, another Delaware limited liability company of which Blue Highways was the sole member. Pls.' Exs. 68-69.

Meanwhile, on April 2, 2012, JL Powell LLC's board terminated Powell's employment, and Powell and JL Powell LLC executed a separation agreement and release. Willard Decl. Ex. 11 (ECF No. 3-12) (the "**Separation Agreement**"). The first catalog published following Powell's separation from JL Powell, LLC, the Summer 2012 catalog, featured a personal message signed by "J.L. Powell," but the Winter 2012 catalog did not. The Fall 2013 catalog, however, featured a message with the "J.L. Powell" signature beneath it.

Around April of 2013, Powell launched a new sportswear and accessories catalog named "The Field" and a corresponding e-commerce website, thefieldoutfitting.com. On the front cover of the first and second issues of The Field, under the catalog's title, it says "In the Salt: Dispatch – J. Powell." Pls.' Exs. 48-50. On the inside front cover of the catalog is a photograph of Powell and a message to

the customer from Powell signed "Josh Powell." Pls.' Exs. 48, 50. The Plaintiffs claim that thefieldoutfitting.com contains the terms "JL Powell" and "the sporting life" as meta-tags.[4] Pls.' Ex. 56.

One of The Field's suppliers, Rancourt & Co. ("Rancourt"), based in Lewiston, Maine, posted on its website an interview with Michael Rancourt, President of Rancourt, which was filmed by The Field. Alongside the link to the interview was the following text: "The Field is a new catalog and ecommerce outfitter specializing in high end goods for the sporting life. We are happy to be part of this new venture from Josh Powell, the man behind the JL Powell company." Pls.' Ex. 54. The Field's blog, Thefielddaily.com, also posted the interview and a link to Rancourt's website. Pls.' Ex. 53, at 5.

## PROCEDURAL HISTORY

On April 25, 2013, JL Powell Clothing LLC filed a complaint and motion for temporary restraining order and preliminary injunction against Powell individually and d/b/a The Field Outfitting Company, and Brownells, Inc., also d/b/a The Field Outfitting Company, (ECF Nos. 1 & 3). The complaint alleged trademark infringement and breach of contract claims and sought specific enforcement of Section 7.1(b) of the Contribution Agreement. The motion for temporary restraining order and preliminary injunction seeks to enjoin Powell from any further use of his name and endorsement in connection with The Field. On May 2, 2013, the parties

---

[4]     A meta-tag is: "An HTML tag that contains descriptive information about a webpage and does not appear when the webpage is displayed in a browser." The American Heritage Dictionary 1106 (5th ed. 2011).

reached a standstill agreement that eliminated the need for a temporary restraining order. (ECF. No. 16.)

On May 10, 2013, the Defendant filed a motion to dismiss or transfer venue arguing that the Court lacked personal jurisdiction over Powell, and claiming that JL Powell Clothing LLC lacked standing to enforce the contracts at issue and that the complaint failed to state a claim for which relief could be granted. (ECF No. 33). On May 31, 2013, JL Powell Clothing LLC filed an amended complaint that added JL Powell LLC as a plaintiff and dismissed Brownells, Inc. as a defendant. (ECF No. 39). The Plaintiffs' six-count amended complaint asserts three trademark infringement claims: dilution of a famous mark under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) (Count I), likelihood of confusion under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count II), and trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Count III); two state trademark infringement claims: unfair competition under the Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1211-1216 (Count IV), and trademark dilution under the Maine Anti-Dilution Statute, 10 M.R.S.A. § 1530 (Count V); and one claim involving breach of the Contribution Agreement and requesting specific performance (Count VI). The Plaintiffs also seek an order enjoining Powell and his new company from using Powell's name and endorsement or the marks "J.L. Powell" and "The Sporting Life."[5]

---

[5] The Court has before it four different iterations of the Plaintiffs' request for injunctive relief. *See* Compl. at 22-24 (ECF No. 1); Mot. for TRO and Prelim. Inj. at 19-20 (ECF No. 3); Am. Compl. at 20-21 (ECF No. 39); and Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj. at 7 (hereinafter "Pls.'

On June 10, 2013, the Defendant filed a second motion to dismiss or transfer the amended complaint (ECF No. 49), which prompted the Plaintiffs to file a motion to permit JL Powell LLC to join the pending motion for preliminary injunction. (ECF No. 54). In separate orders, the Court denied the Defendant's second motion to dismiss (ECF No. 58) and granted the Plaintiffs' motion to permit JL Powell LLC to join the motion for preliminary injunction (ECF No. 57).

The Court held an evidentiary hearing on the Plaintiff's motion for preliminary injunction on June 13, 2013. Following the hearing, the Defendant moved to supplement the record. (ECF No. 59). Attached to the Defendant's motion was a letter from counsel for the Defendant to JL Powell LLC notifying JL Powell LLC that the Defendant was providing written notice of his termination of Section 7.1(b) of the Contribution Agreement. (ECF No. 59-1) ("**Notice of Termination**").

On August 30, 2013, the Defendant filed an answer along with six counterclaims, (ECF No. 63), and filed his own motion for preliminary injunction asking the Court to enjoin the Plaintiffs from using his name or endorsement. (ECF. No. 66).[6] In a separate order also filed today, the Court granted the Plaintiffs' motion to dismiss Count II of the Counterclaims (breach of the covenant of good faith and fair dealing), but denied the motion to dismiss as to Count I (breach of contract), Count III (declaratory judgment), Count IV (false association and unfair competition under the Lanham Act), Count V (misappropriation of right of publicity

---

Reply") (ECF No. 46). Since the Plaintiffs' Reply contains the most recent request for relief, the Court considers that iteration.

[6]     To avoid confusion, the Court will continue to refer to Powell as the Defendant rather than switch back and forth between Defendant and Counterclaim-Plaintiff.

under Michigan law), and Count VI (false light in the public eye under Michigan law).  Order on Mot. to Dismiss Countercls. (ECF No.79).

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

"'An injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id.* (quoting *Weinberger v. Romero–Barceló,* 456 U.S. 305, 312 (1982) (internal quotation marks omitted)). But "'if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002))."The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id*. at 18.

## DISCUSSION

This case has developed in stages in the eight months since it commenced, and the parties have added to, shifted, and refined their arguments throughout. The

facts have also developed: on July 11, 2013, the Defendant sent the Notice of Termination to JL Powell LLC, and, sometime in the summer of 2013, the Plaintiffs released the Fall 2013 J.L. Powell catalog, using a "J.L. Powell" signature that the Defendant claims is violative of his rights and thus material to his claim for preliminary injunction. The Court has carefully considered whether any of these developments—factual or argumentative—has prejudiced the other side, and determined that they have not, but that each side has had ample opportunity to respond to the other in this moving target of a case. The Court therefore: (1) **GRANTS** the Defendant's motion to supplement the record, and (2) endeavors here to adjudicate the parties' motions for preliminary injunction using the complete universe of information and arguments now before it.

The heart of this case, as it has developed, is: (A) whether Section 7.1(b) of the Contribution Agreement is valid and enforceable; (B) whether, if Section 7.1(b) is valid and enforceable, the Defendant is likely to have breached it; (C) whether, if the Defendant breached 7.1(b), preliminary injunctive relief in favor of the Plaintiffs is appropriate; (D) whether JL Powell Clothing LLC violated any of the Defendant's rights; and (E) whether, if so, the Defendant should be granted preliminary injunctive relief. Also at issue, and dealt with separately under Section (F), is whether the Defendant's use of the trademark "The Sporting Life" calls for preliminary injunctive relief in the Plaintiffs' favor.

### A. Validity and Enforceability of Section 7.1(b)

The Defendant argues that Section 7.1(b): (1) is a license or a contract for personal services that is terminable at will and that was terminated by the July 11, 2013 Notice of Termination;[7] (2) is void because sale of the exclusive right to use one's name commercially violates the Thirteenth Amendment; (3) was abandoned by JL Powell LLC; (4) was superseded by the employment and separation agreements that JL Powell LLC entered into with the Defendant;[8] (5) became void through JL Powell LLC's breach of the Contribution Agreement; and/or (6) is unenforceable because JL Powell LLC is an empty shell. The Court finds all of these arguments unpersuasive.

### 1. Whether Section 7.1(b) Has Been Terminated

The Defendant purported to terminate the rights and covenants granted under Section 7.1(b) of the Contribution Agreement with the July 11, 2013 Notice of Termination. The Defendant cites two related bodies of law, those dealing with licenses and those dealing with personal services contracts, to support his contention that he had the right to terminate at will the rights and covenants he granted to JL Powell LLC in Section 7.1(b).

### a. License

The Defendant asserts that the right to use his name and endorsement granted in Section 7.1(b), is terminable at will because it is a license of indefinite

---

[7]     The Court decided against the Defendant on this issue in its order on the Defendant's motion to dismiss, but the Defendant expanded his arguments on this issue in his motion for preliminary injunction.

[8]     The Defendant made this argument in his motion to dismiss the Amended Complaint, but, because it relied on documents outside the four corners of the complaint, the Court deferred consideration to the preliminary injunction analysis.

duration, and because he extended this license to JL Powell LLC without receiving any consideration. *See Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 19-20 (E.D.N.Y. 1994); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1345 (E.D.N.Y. 1994) (owner of "Dial-A-Mattress" service mark had right to terminate at will alleged license to use this mark, for which licensee had paid no consideration), *Butkus v. Downtown Athletic Club of Orlando, Inc.*, No. CV 07-2507, 2008 WL 2557427, *6 (C.D. Cal. 2008) (professional football player retained sole right to commercially exploit his own name, notwithstanding prior gratuitous permission, now revoked, to use his name as part of collegiate linebacker award), *Trace Minerals Research, L.C. v. Mineral Res. Int'l, Inc.*, 505 F. Supp. 2d 1233, 1241 (D. Utah 2007) (owner of trademark "ConcenTrace" had right to terminate at will royalty-based license of the trademark for unspecified duration).

*Trace Minerals* cites *Dial-A-Mattress* for the proposition that "[a] license containing no time frame is generally terminable at will." *Trace Minerals*, 505 F. Supp. 2d at 1241. *Dial-A-Mattress*, in turn, founds this principle on Section 96 of Corbin on Contracts. 1 Arthur L. Corbin, *Corbin on Contracts* § 96 at 413 (1963). But page 413 of *Corbin on Contracts* does not state that a license containing no time frame is generally terminable at will. In fact, it does not discuss "licenses" at all, but rather, "contracts between a producer and his distributing agent." *Id.* With regard to distributorship agreements, Corbin opines that such contracts *may be* terminable at will if they do not specify any particular time for termination, except in situations

where it would be inequitable to abruptly terminate the agreement, and under such circumstances the contract may be terminated only upon reasonable notice. *Id.*

Where distributorship agreements are concerned, the parties contemplate that both the producer and the distributing agent will receive an ongoing benefit from the arrangement, and it is only when one side or the other no longer receives the expected benefit, or the benefit is no longer attractive enough to sustain the obligation, that that side may decide to terminate the agreement. This more or less describes the situations in both *Butkus* and *Trace Minerals*. Butkus became dissatisfied with the conduct of the company administering the Butkus Award and revoked his permission to use his name. *Butkus*, 2008 WL 2557427 at *3. In *Trace Minerals*, the plaintiff agreed to license its trademark to the defendant in exchange for a 1% sales royalty, capped at $7,500. *Trace Minerals*, 505 F. Supp. 2d at 1240-41. At some point, this apparently was no longer satisfactory to the plaintiff, whereupon it terminated the license. *Id.*

By contrast, the parties in this case did not contemplate any ongoing benefit to the Defendant, either reputational or monetary, arising out of the rights and covenants he conveyed to JL Powell LLC in Section 7.1(b) of the Contribution Agreement. Rather, the Defendant received the total benefit of his bargain up-front in the form of a 43% stake in the newly-capitalized JL Powell LLC.[9] Since performance was fully rendered by Blue Highways as of the execution of the

---

[9]     The Defendant's claim that he received no consideration in exchange for the rights and covenants he conveyed under Section 7.1(b) is meritless.

Contribution Agreement, neither *Butkus* nor *Trace Minerals* is applicable.[10] *Cf.* 1 *Corbin on Contracts* § 96 at 418 (an employment agreement may be terminable at will where there is "no executed consideration.").

### b. *Personal Services Contract*

The Defendant also contends that the Court was in error in holding that Section 7.1(b) is not a personal services contract. *See* Order on Mot. to Dismiss 24 (ECF No. 58). The Defendant claims that an "endorsement agreement"—his term for Section 7.1(b)—is a "personal services contract." *See Agassi v. Planet Hollywood Int'l, Inc.*, 269 B.R. 543 (D. Del. 2001). He then reiterates his assertion that a contract for personal services with no stated duration is terminable at will, and that he terminated Section 7.1(b) in July of 2013. *See Del. Fin. Mgmt. Corp. v. Vickers*, No. Civ. A. 96C-10-032, 1999 WL 458633, *6-7 (Del. Super. Ct. June 9, 1999).

The Court has already noted that *Vickers* is distinguishable from this case. Order on Mot. to Dismiss 24. There is likewise no hint that the contracts involved in *Agassi* were in any respect comparable to Blue Highways' 2010 acquisition of the Defendant's company or to the rights and covenants conveyed by the Defendant in Section 7.1(b) as part of that transaction. The contracts in *Agassi* involved celebrity

---

[10] The facts of *Dial-A-Mattress* are even less favorable to the Defendant. The plaintiff had a long-standing federally-registered service name in "Dial-A-Mattress" but the defendant had incorporated his business under the name "Dial-A-Mattress Inc." *Dial-A-Mattress,* 841 F. Supp. at 1344. The plaintiff purchased this corporate name from the defendant to strengthen its "Dial-A-Mattress" rights, but after the sale the defendant continued to use "Dial-A-Mattress" in his business advertisements. *Id.* at 1345. The plaintiff sued, and the defendant claimed to have a license to use this service name from the plaintiff, either through oral contract or by implication through the plaintiff's prior acquiescence to his continued use of the service name. *Dial-A-Mattress,* 847 F. Supp. at 19-20, n.1. The defendant did not claim to have paid anything to the plaintiff for his use of the "Dial-A-Mattress" service name. *Dial-A-Mattress,* 841 F. Supp. at 1345. Under these circumstances, the district court, which did not think much of the defendant's claim to a license to begin with, found that any such license was terminable at will by the plaintiff. *Dial-A-Mattress*, 847 F. Supp. at 19-20.

athletes agreeing to promote a chain of sports-themed restaurants. *Agassi*, 269 B.R. at 545. The celebrities were allowed to avoid continuation of these contracts after Planet Hollywood, which owned the restaurants, filed for Chapter 11 bankruptcy. *Id.* at 547. At a minimum, the contracts in *Agassi* appear to have contemplated some ongoing performance by both sides. *See id.* at 545 (referring to the contracts as "executory endorsement contracts.")

By contrast, the contract in this case was fully performed in March of 2010. The parties agreed to form a new company, JL Powell LLC, to which Blue Highways contributed $2.5 million and to which the Defendant contributed his company's assets, the exclusive right to commercial use of his name and endorsement, and a covenant not to use his name and endorsement in any competing business. Both sides received shares in the new company in exchange for their contributions. This does not contemplate any ongoing performance by either side, and is thus not a "personal services contract" as that term is understood in *Vickers* or *Agassi*.

### 2. Whether Section 7.1(b) Is Invalid Under the Thirteenth Amendment

The Defendant claims that Section 7.1(b) is void because sale of the exclusive right to use one's name commercially violates the Thirteenth Amendment. This finds no support in the law. The cases cited by the Defendant regarding the impermissibility of compelling the performance of personal services contracts all dealt with contracts in which services were actually to be performed. *See Gov't Guar. Fund of Republic of Fin. v. Hyatt Corp.*, 95 F.3d 291, 303 (3d Cir. 1996) (discussing hotel management contracts); *Read v. Wilmington Senior Ctr., Inc.*, No.

C. A. No. 12586, 1992 WL 296870 *1 (Del. Ch., Sept. 16, 1992) (refusing to order individuals to take part in a musical performance on grounds that it would compel involuntary servitude); *People v. Lavender*, 48 N.Y.2d 334, 338, 398 N.E.2d 530 (N.Y. 1979) (invalidating on Thirteenth Amendment grounds a state statute that criminalized failure to complete home improvement contracts).

By contrast, the Defendant objects to Section 7.1(b), not because it actually requires him to perform any services, but because the Plaintiffs' use of his name and endorsement creates the false appearance that he continues to be a spokesperson for the J.L. Powell catalog. This argument does not implicate the Thirteenth Amendment's prohibition against involuntary servitude.

### 3. Whether JL Powell LLC Abandoned Section 7.1(b)

The Defendant also contends that the Plaintiffs abandoned the rights granted in Section 7.1(b) "when they ceased to use messages from Mr. Powell, images of Mr. Powell, and his signature in the J.L. Powell catalog." Counterpl.'s Mot. for Prelim. Inj. 16. (ECF No. 66). Under Delaware law, "'a contract remains in force until and unless it has been terminated according to its terms or by actions of the parties.' Abandonment, however, may constitute one of those actions." *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 572 (D. Del. 1993) (failing to show up at work and hiring a replacement for oneself may constitute abandonment of employment) (quoting *Artesian Water Co. v. State Dept. of Highways & Transp.*, 330 A.2d 441, 443 (Del.

1974).[11] The Defendant has failed to cite any meaningful authority that supports the proposition that the Plaintiffs' purported failure to exercise its right to use the Defendant's name and endorsement for at most a year and a half can be construed as a voluntary relinquishment of these rights with no intention of reclaiming them. *See id.* ("Abandonment is defined as 'the voluntary relinquishment of all right, title, claim and possession, with the intention of not reclaiming it.'" (quoting Black's Law Dictionary 13 (4th ed. 1957)). This is especially so where the Plaintiffs recommenced using the Defendant's name and endorsement in the Fall 2013 catalog.

### 4. Whether Section 7.1(b) Was Superseded by the Employment and Separation Agreements

The Defendant argues that the Plaintiffs may not enforce the Contribution Agreement because it was superseded by the Defendant's Employment and Separation Agreements. The Defendant's November 1, 2011 Employment Agreement provides:

> **Entire Agreement.** This Agreement along with the Proprietary Information Agreement and the Operating Agreement[12] collectively embody the entire agreement of the parties with respect to the matters addressed herein and supersede any other prior oral or written agreements, arrangements or understandings between [Powell] and the Company.

Amended Employment Agreement at 9. The Employment Agreement's purpose is to "amend and restate" the employment agreement that Powell entered into with JL Powell LLC on March 10, 2010. Amended Employment Agreement at 1. The

---

[11]     The Contribution Agreement is governed by and construed in accordance with Delaware law. Contribution Agreement §12.7.

[12]     Neither the Proprietary Information Agreement nor the Operating Agreement have been filed with the Court.

Amended Employment Agreement governs Powell's term of employment, his compensation, and grounds for termination. It protects JL Powell LLC's intellectual property, and it contains a non-competition and non-disparagement provision. Powell's Separation Agreement with JL Powell LLC also has an integration clause.[13] The Separation Agreement marks the end of Powell's employment.

The Court is not persuaded that the employment or separation agreements supersede the Contribution Agreement, which governed the 2010 sale of JLP's assets to JL Powell LLC. The Contribution Agreement and Bill of Sale—JL Powell LLC's founding documents—are fundamentally separate and distinct from the employment and separation agreements. The Court is unpersuaded that the Contribution Agreement was superseded by these agreements.

The Defendant's argument also fails to account for the March 10, 2010 Employment Agreement which was executed simultaneously with the Contribution Agreement and Bill of Sale. The March 10, 2010 Employment Agreement contained an integration clause identical to the Amended Employment Agreement. By the Defendant's logic, the March 10, 2010 Employment Agreement would have

---

[13]

       Entire Agreement. This agreement contains the entire understanding and agreement between the parties with respect to its subject matter, and supersedes all prior oral or written understandings and agreements relating thereto, except that (a) the terms and provisions of the Restrictive Covenants in the [Employment Agreement] (and defined terms found elsewhere in the EA that are used to interpret, understand, implement and enforce the terms and provisions of the Restrictive Covenants of the [Employment Agreement]), and (b) any agreements, provisions or promises by the Executive regarding confidentiality, non-disclosure of information or property, non-competition or non-solicitation shall survive and remain in force and effect.

Separation Agreement at 8.

superseded section 7.1(b) of the March 10, 2010 Contribution Agreement. This cannot be what the parties intended.

### 5. Whether Section 7.1(b) Was Rendered Void Through JL Powell LLC's Breach of the Contribution Agreement

The Defendant claims that his obligations under Section 7.1(b) were rendered void when JL Powell LLC wrongfully attempted to assign these rights to JL Powell Clothing LLC without his consent or the consent of his company, JLP.

Section 12.8 of the Contribution Agreement governs assignment. It provides:

> Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior consent of JLP and [JL Powell LLC]. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Contribution Agreement § 12.8. This provision prohibits JL Powell LLC from assigning its rights under the agreement without obtaining JLP's prior written consent. The Court finds it likely that, having failed to obtain JLP's written consent to this assignment, the assignment is voidable by JLP. *See Paul v. Chromalytics Corp.*, 343 A.2d 622, 626 (Del. Super. 1975) ("[t]he obligor, of course, may gain, from a valid and unwaived non-assignability provision, the prerogative to resist or even nullify the assignment.")[14] Without a valid assignment, JL Powell Clothing LLC does not have the right to enforce Section 7.1(b).[15]

---

[14]    The parties have not clarified their positions regarding: (1) whether JL Powell LLC's assignment to JL Powell Clothing LLC is actually void, (2) whether it is merely possible for JLP to nullify the assignment, or (3) whether the assignment is valid and JLP merely has the right to damages arising out breach of the non-assignability provision. The law in Delaware on these issues appears to be unsettled. *See SLMSoft.Com, Inc. v. Cross Country Bank*, No. Civ.A. 00C09163JRJ, 2003 WL 1769770, *9 (Del. Super., April 2, 2003) ("[a]bsent any other provision that expressly makes

The Defendant claims that this assignment was a material breach of the Contribution Agreement which: (1) allows the Defendant to terminate Section 7.1(b) of the contract; and (2) makes any subsequent use by the Plaintiffs of the Defendant's name and endorsement unauthorized and subject to injunctive relief. The Court addresses the Defendant's first contention here, and his second contention in Part D of this opinion, *infra*.

Under Delaware law, "[a] party is excused from performance under a contract if the other party is in material breach thereof." *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). In explaining Delaware's standard for determining whether a breach of contract is material, the *BioLife* court cited factors listed in Section 241 of the *Restatement (Second) of Contracts*:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to

---

subsequent assignment void, the assignment is valid, but in breach of the . . . agreement."), and compare *Chromalytics, supra*. The parties have also not clarified whether the "right, license, and permission" granted by Powell under Section 7.1(b) should be treated differently from Powell's covenant not to use his name. *See Chromalytics,* 343 A.2d at 626, n.1 (hinting that, while contract rights are assignable, contract obligations may not be) and *compare with Restatement (Second) of Contracts* Section 322(2)(c) (stating that an obligor still must discharge his duties even in the face of an improper assignment). But the Court at present need only determine this issue on a "likelihood" standard, which, absent development by the parties, is satisfied by the law articulated in *Chromalytics*.

[15]     It is important to distinguish the contractual right to use the name and endorsement of Powell from the intellectual property rights in the trade name "J.L. Powell." The Bill of Sale governed the sale of JLP's intellectual property, which was defined in the Contribution Agreement to include "trade names, trademarks, service marks, and logos . . . ." Contribution Agreement § 4.10. The Bill of Sale contained an assignment clause which allowed JL Powell LLC to assign its rights under the Bill of Sale to any successor to "all or substantially all of its business (whether by sale of ownership interests or assets, merger, consolidation or otherwise.)" Bill of Sale § 6. Accordingly, it appears that JL Powell Clothing LLC is the rightful owner of the registered trade name "J.L. Powell" and the registered trademark, "The Sporting Life."

perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Biolife*, 838 A.2d at 278 (quoting the *Restatement (Second) of Contracts* § 241 (1981)).

In spite of the personal nature of the rights and covenants contributed by the Defendant in Section 7.1(b), the Court perceives no basis on which the fact finder might determine that JL Powell LLC's assignment of those rights and covenants deprived the Defendant of the benefit he reasonably expected from the Contribution Agreement. The central benefit the Defendant obtained from the Contribution Agreement was a 43% stake in a business with an additional $2.5 million in capital. This benefit was not impaired by the assignment.

The Court finds it unlikely that this assignment constitutes a material breach of the Contribution Agreement voiding the contract or excusing the Defendant from his obligations under Section 7.1(b).

### 6. Whether JL Powell LLC Is an Empty Shell Without Authority to Enforce Section 7.1(b)

Finally, the Defendant argues that JL Powell LLC cannot enforce Section 7.1(b) because Blue Highways foreclosed on all of its assets and JL Powell LLC is now an empty shell. But Bruce Willard, Chair of the Board of both JL Powell LLC and JL Powell Clothing LLC, testified that JL Powell LLC is a company currently in good standing and that it has an active bank account from which it pays debts owed to vendors and rent on a physical facility. Tr. of Prelim. Inj. Hr'g at 175-77

(ECF No. 55) (hereafter "**Tr**. at \_\_\_"). It may sue to enforce its contractual rights. *See* Del. Code Ann. Tit. 6, § 18-106 (powers of limited liability companies).

## B. Breach of Section 7.1(b)

On this record, the Plaintiffs have demonstrated that JL Powell LLC owns the rights described in Section 7.1(b) and that these rights are valid and enforceable. The Court now turns to whether the Plaintiffs have demonstrated that it is likely that Powell breached Section 7.1(b).

Powell does not deny that he used his name and endorsement in connection with The Field. Rather, he claims: (1) that relevant case law establishes that, even though he sold his eponymous business, he still has the right to use his name to identify his current, competing business venture; and (2) that because JL Powell Clothing was not in existence when the Contribution Agreement was executed, it cannot be an "affiliate" of JL Powell LLC.

### 1. An Individual's Right to Continue Using the Name He Sold

The Defendant points to two cases, *Madrigal Audio Lab., Inc. v. Cello, Ltd.,* 799 F.2d 814 (2d Cir. 1986), and *JA Apparel Corp. v. Abboud,* 682 F. Supp. 2d 294 (S.D.N.Y. 2010), to support his contention that an individual who sold his trade name along with his former business may nevertheless still use his name to identify his current, competing business venture. In *Madrigal,* Mark Levinson, a well-known high-end audio equipment designer, founded Mark Levinson Audio Systems, Inc. ("**MLAS**") to produce audio equipment. MLAS got into serious financial trouble, and Levinson brought in investors who added capital and management assistance.

Levinson was made an advisor and product developer and entered an employment agreement in which he conveyed to MLAS

> "the permanent and exclusive right, title and interest to the trade name 'Mark Levinson', and all variations thereof, in connection with the sale [and] distribution" of audio equipment and not to use or permit the use of the Levinson trade name, other than by MLAS, in connection with the audio business.

*Madrigal,* 799 F.2d at 817.

Levinson's relationship with MLAS deteriorated, and he left and formed a new audio equipment company, Cello, Ltd. ("**Cello**"). MLAS was forced into bankruptcy and a new entity, Madrigal, purchased at auction all the assets of MLAS, including the "Mark Levinson" trade name. There was no mention of Levinson's employment contract or Levinson's agreement not to compete during the asset sale.

Cello's first product bore a silver label that said "Cello by Mark Levinson," and the company issued a promotional brochure entitled "Cello by Mark Levinson" that began with a "Note from Mark Levinson" and contained photos of Levinson throughout. *Id* at 817. Madrigal brought suit alleging violations of the Lanham Act and sought and received an injunction against Cello's use of the Mark Levinson trade name and mark. Neither Cello nor Levinson appealed the granting of that injunction.

In connection with the promotion of Cello's products, Levinson also personally contacted "high end" audio equipment dealers, spoke with journalists

about his connection with Cello and attended a trade show. *Id.* at 818-19. Madrigal

then sought and received a second injunction – this one

> (1) barring Levinson and Cello "from generating any publicity"
> regarding Levinson's relationship with Cello or past relationship with
> MLAS, (2) enjoining Levinson from communicating with dealers or
> customers on Cello's behalf, and (3) ordering Cello to inform all persons
> who had received Cello publicity brochures advertising Levinson's
> designing of products for Cello that Madrigal owned the Levinson
> trade name and trademark.

*Id.* at 816. Cello appealed and the Second Circuit reversed.

The Second Circuit explained that Levinson had sold MLAS the right to "use"

the Levinson *trade name*, not the right to use Levinson's personal name. "Use" was

further defined in the employment agreement as "'use . . . (a) as part of a name of a

corporation, partnership, joint venture, proprietorship, firm or business or (b) as the

name, symbol or identification of any product.'" *Id.* at 823. Thus, the specific

language of Levinson's employment agreement made it clear that what he sold was

his trade name. The Second Circuit explained that

> even when a personal name has become a trade name it continues to
> serve the important function to its bearer of acting as a symbol of that
> individual's personality, reputation and accomplishments as
> distinguished from that of the business, corporation or otherwise, with
> which he has been associated. Accordingly, though an individual may
> sell the right to use his personal name, a court will not bar him from
> using that name unless his "intention to convey an exclusive right to
> the use of [his] own name" is "clearly shown." Whether a person who
> sells the trade name rights to his personal name is barred from using
> his personal name depends on the terms of the sale.

*Id.* at 822-23 (internal citations omitted) (quoting *Guth Chocolate Co. v. Guth,* 215

F. 750, 767 (D. Md. 1914)). Looking at the terms of the agreement the court

concluded that Levinson's sale of his name to MLAS

did not preclude Levinson from engaging in the audio business through a company other than Madrigal or from advertising his affiliation with such a company. In short he did not sell or forfeit his right to use his own personal name as long as he did not use it as the trade name of another business.

*Id.* at 823.

Similarly, in *Abboud,* the district court concluded that designer Joseph Abboud had sold only his "trade names" and not the exclusive use of his personal name for all commercial purposes. *Abboud.* 682 F. Supp. 2d at 307. The evidence strongly suggested that Abboud never meant to convey his personal name. Among the evidence was a letter written by Abboud to the CEO of the acquiring company stating:

> If, for whatever reasons, the corporation does not want to continue with my services after five years, I want the option to practice my skills should I choose to continue working in the future. It goes without saying that at *no time* will I have any rights to any of the Joseph Abboud trademarks. Here is where you must separate Joseph Abboud personally from the Joseph Abboud trademarks.

*Id.* at 304-05.

*Madrigal* and *Abboud* both teach that the devil is in the details of the parties' agreements. In Section 7.1(b), in connection with the transfer of all JLP's trade names and trademarks, Powell personally granted to JL Powell LLC:

> throughout the world the sole and exclusive right, license, and permission to use his name and endorsement to exploit, turn to account, advertise, and otherwise profit from [JL Powell LLC's] goods and services bearing such name, image,[16] and/or endorsement.

---

[16]    Although the Plaintiffs initially sought to enjoin the use of the Defendant's image, they made clear in the hearing on their motion for preliminary injunction that they were no longer seeking an injunction to prevent Powell from using his image or likeness standing alone, but were only interested in stopping him from using his name and signature.

Powell also agreed:

> that he shall not, on behalf of himself or any other person or entity, grant any similar right of any kind in connection with any business competitive in any respect with [JL Powell LLC] or any of its affiliates and/or subsidiaries.

Powell further agreed:

> that he will not use his name or permit any other person or entity to use his name, and otherwise will not assert any right to use his name, including but not limited to any right to use his name under the doctrine of fair use, in connection with any business competitive in any respect to [JL Powell LLC] or any of its affiliates and/or subsidiaries.

Contribution Agreement § 7.1 (b).

Section 7.1(b) of the Contribution Agreement is broader than the agreements at issue in *Madrigal* and *Abboud*. In Section 7.1(b) Powell grants the exclusive use *of his name* and agrees not to use *his name* or permit any other person or entity to use *his name* in connection with any business competitive in any respect to JL Powell LLC or any of its affiliates and/or subsidiaries. Powell's grant in Section 7.1(b) goes beyond the conveyance of trademarks or trade names.[17] Section 7.1(b)'s contemplation of the trademark concept of "fair use" itself adds support to the conclusion that Powell was conveying the use of his personal name in addition to a trade name. "In technical trademark jargon, the use of words for descriptive purposes is called a 'fair use,' and the law usually permits it even if the words themselves also constitute a trademark." *WCVB-TV v. Boston Athletic Ass'n*, 926

---

[17] While contained in a subsection entitled "Use of Trademarks," the Contribution Agreement also provides in section 12.11 that: "The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of the Agreement." Contribution Agreement § 12.11.

F.2d 42, 46 (1ˢᵗ Cir. 1991). By agreeing not to assert a fair use defense, Powell is essentially giving up his right to use his name, even for descriptive purposes, in connection with any business competitive with JL Powell LLC and its affiliates and subsidiaries.

### 2. "Future" Affiliates Under Section 7.1(b)

The Defendant claims that JL Powell Clothing LLC is not an affiliate of JL Powell LLC because it was not in existence at the time of the contract, and the contract does not contemplate "future" affiliates. This argument is unpersuasive. At the time the Contribution Agreement was executed, JL Powell LLC had no subsidiaries, and yet the contract contemplates that Powell will not compete with any of JL Powell LLC's subsidiaries. The parties must therefore have intended that this term include future such entities. Under the Defendant's interpretation, the language "affiliates and/or subsidiaries" would be superfluous. *Intel Corp. v. Am. Guar. & Liab. Ins. Co.,* 51 A.3d 442, 451 n.22 (Del. 2012) (a contract should be interpreted so as to give meaning to each of its provisions).

### 3. Breaching Activity

Powell's name appeared on the front cover of the first two issues of The Field and his signature appeared on the inside cover of the first two issues of The Field. In Powell's signed note in the first two issues of The Field, he explicitly says that he has been "traveling the world over not only refining my designs and seeking the finest quality craftsmen possible, but also seeking out the best experiences and adventures to bring to *my loyal customers.*" Pls.' Exs. 48, 50 (emphasis added).

Powell is using his name in connection with a business competitive with the Plaintiffs. It is also likely that Powell permitted Rancourt to use his name in its blog post about The Field. The Field's website directed customers to Rancourt's website, which contained the blog post. The Court finds that it was likely that Powell knew about the blog post's use of his name in connection with The Field and did not ask Rancourt to take down the references to his name.

Having received consideration for the promises he made in connection with the Contribution Agreement, Powell cannot now "keep for himself the essential thing he sold, and also keep the price he got for it." *Guth,* 224 F. at 934. For these reasons, the Court concludes that JL Powell LLC has demonstrated a likelihood of success on Count VI involving breach of the Contribution Agreement.

## C. Whether the Plaintiffs are Entitled to Preliminary Injunctive Relief

Having found a likelihood of success on the merits of the Plaintiffs' breach of contract claim, the Court now turns to the other preliminary injunction factors to determine whether the Plaintiffs have met their burden of establishing "that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest." *Voice of the Arab World*, 645 F.3d at 32.

## 1.    Irreparable Harm

Section 12.13 of the Contribution Agreement explicitly states:

> The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof in addition to any other remedy at law or in equity.

Pls. Ex. 42, at 51. The Defendant has made no argument that this provision of the Contribution Agreement does not apply. The Court concludes that the Plaintiffs have demonstrated irreparable harm.

## 2.    Balancing the Equities

The hardships balance in the Plaintiffs' favor. The Defendant claims that "Mr. Powell has already incurred significant expense and disruption to his business by virtue of Plaintiffs' Motion which was timed precisely to interrupt Mr. Powell's launch of The Field." Def.'s Opp'n to Pls.' Mot. for TRO and Prelim Inj. 19-20. But the Defendant has produced no evidence of significant expense going forward. The Field distributes new issues periodically. It is unlikely that The Field will distribute issues one and two again. The Defendant has already distributed the third issue of The Field without Powell's name or signature. Pls.' Ex. 51.

The Defendant also argues that the "Plaintiff is attempting to chill any attempt Mr. Powell may make to identify himself." Def.'s Opp'n to Pls.' Mot. for TRO and Prelim. Inj. 19. (ECF No. 36). The Defendant overstates the Plaintiffs' requested relief. The Plaintiffs seek a preliminary injunction preventing Powell from using his name or endorsement in connection with The Field. Powell may still

use his name and signature personally and in businesses that do not compete with the Plaintiffs.

In *Levitt Corp. v. Levitt,* 593 F.2d 463 (2d Cir. 1979), the Second Circuit affirmed an injunction against Levitt, the builder of Levittowns in New York and Pennsylvania, who parted ways with Levitt and Sons (the predecessor to Levitt Corp.) after granting Levitt and Sons the use of his name and its goodwill. The court explained:

> If the infringing party has had some experience of his own in an industry, and wishes to establish a business under his own name, it is considered unfair to preclude him from using his name under all circumstances and for all times, although the first-comer has established a reputation and goodwill under the same appellation. . . . Where, as here, however, the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable. . . . To protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to "keep for himself the essential thing he sold, and also keep the price he got for it."

*Id.* at 468 (citations omitted) (quoting *Guth,* 224 F. at 934). Guided by this principal, the Court concludes that the balance of the equities favors the Plaintiffs.

### 3.      Public Interest

The public has an interest in enforcement of agreements. This factor also favors the Plaintiffs. Having considered each of the four equitable factors, the Court concludes that a preliminary injunction arising out of the Defendant's likely breach of the Contribution Agreement is appropriate.

### D. Whether JL Powell Clothing LLC Violated Any of the Defendant's Rights

In his role as counterclaimant, Powell asserts that JL Powell Clothing LLC has no right to use his name or endorsement in its business, but that it nevertheless used his name in a personal message to customers in the Fall 2013 J.L. Powell catalog. He asks for an order preliminarily enjoining JL Powell LLC and JL Powell Clothing LLC from further using his name and endorsement to suggest that the Defendant is a personal spokesperson, promoter, or endorser of the J.L. Powell catalog.

The claims under which the Court analyzes this request are Counterclaim Counts IV, V, and VI. The Court has determined that Count I (breach of contract) is not likely to succeed, *see* Section (A)(5), *supra*, and dismissed Count II (breach of the covenant of good faith and fair dealing), *see* Order on Mot. to Dismiss Countercls. (ECF No. 79). Count III is a claim for declaratory judgment, which is a form of relief rather than a cause of action and therefore it cannot stand as a basis for granting injunctive relief.

Under Counts IV, V, and VI, Powell asserts claims against JL Powell Clothing LLC for false association and unfair competition under 15 U.S.C. § 1125(a),[18] and for misappropriation of publicity rights and false light under Michigan law.[19]

---

[18]     15 U.S.C. § 1125(a) creates liability for those who "in connection with any goods . . . [use] in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."

[19]     A defendant is liable for misappropriation of publicity rights if he appropriates the plaintiff's name or likeness for a predominantly commercial purpose. *Battaglieri v. Mackinac Ctr. for Pub.*

The Plaintiffs do not contest the fact that JL Powell Clothing LLC produced the Fall 2013 J.L. Powell catalog. The Court also agrees with the Defendant that, because JL Powell Clothing LLC's assignment of the right to use the Defendant's endorsement is likely voidable by JLP, any use by the JL Powell Clothing LLC of the Defendant's name and endorsement is unauthorized and subject to injunctive relief. On the other hand, Powell does not question JL Powell Clothing LLC's right to use the J.L. Powell trademark. The likelihood of success on the merits thus depends on a showing that the Fall 2013 catalog did not simply use the J.L. Powell trademark but went beyond this into an unpermitted use of Powell's name and endorsement.

Page 3 of the Fall 2013 catalog begins with the following words in a large script-font:

*"For me, 50 miles an hour is a perfect speed."*

Def's Answer, Ex. E (image of Fall 2013 J.L. Powell catalog page). This is followed by a description of a motorcycle and the joys of riding a motorcycle, combined with observations on J.L. Powell's clothing including the "spirit of adventure" which is "woven into every piece of clothing we design." *Id.* This is followed by a facsimile of Powell's "J.L. Powell" signature as it had appeared in prior J.L. Powell catalogs.

---

*Policy*, 680 N.W.2d 915, 919-20 (Mich. App. 2004). A defendant is liable for placing the plaintiff in a false light for generating publicity which places the plaintiff in a false light in the public eye. *Id.* at 919. To be actionable, the publicity need not be defamatory, but the plaintiff must be subjected to "unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false . . . ." *Sawabini v. Desenberg*, 372 N.W.2d 559, 564 (Mich. App. 1985) (quoting *Restatement (Second) of Torts* § 652 E cmt b).

The Plaintiffs contend that the use of "we" in the body copy signals that J.L. Powell the company is speaking, not Powell personally. *See Abboud*, 682 F. Supp. 2d at 320 (S.D.N.Y. 2010) (use of term "we" signaled company, not individual, speech). But nothing in the Fall 2013 J.L. Powell catalog other than that single "we" indicates that the company is speaking to the reader. The larger quoted words at the top of the page—"For me, 50 miles an hour is a perfect speed . . ."— creates the opposite impression: that Powell personally is conveying a message to the catalog reader.

The Plaintiffs also assert that, in the context of the entire catalog, it becomes clear that the large script-font language quoted at the top of the page is excerpted from a book by motorcyclist and author Ted Simon. This is not apparent to the Court, especially where the language in quotes is not actually attributed to Mr. Simon and is thematically related to the text below it. The only signature that appears on page 3 of the catalog is "J.L. Powell," and this appears to be Powell's actual signature. Powell's signature is not part of the "J.L. Powell" registered trademark owned by the Plaintiffs, which consists of a "standard characters without claim to any particular font, style, size or color." Pls.' Ex. 45.[20] The signature does not consist of "standard characters." Section 7.1(b) of the Contribution Agreement likewise indicates that the parties thought of Powell's signature as something

---

[20]     *Compare*, *e.g.*, the federally-registered service mark for "John Hancock," serial number 85843229, available on the United States Patent and Trademark Office Trademark Electronic Search System, <u>tess2.uspto.gov</u>. The registration for this service mark has a picture of the "John Hancock" signature, and states that "this mark consists of a substantial facsimile of the signature of 'John Hancock' (1737-1793), patriot of the American Revolution, as said signature appears on the Declaration of Independence."

separate from the "J.L. Powell" trademark. Placement of Powell's signature on this page of the J.L. Powell catalog promotes the impression in the reader's mind that Powell himself is the author of the words preceding it and supports Powell's claims of false association and unfair competition, misappropriation of publicity rights, and false light. On balance, the Court believes that it is likely that Powell will succeed on Counts IV, V, and VI of his counterclaim.

## E. Whether Powell Is Entitled to Preliminary Injunctive Relief

Having found that Powell is likely to succeed on the merits of his Counterclaim Counts IV, V, and VI against JL Powell Clothing LLC, the Court considers whether Powell has met his burden of establishing "that [he is] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *Voice of the Arab World*, 645 F.3d at 32.

The Court agrees with the Defendant that JL Powell Clothing LLC's use of the Defendant's actual signature creates a false impression that he continues to work for and personally endorse his former company, and that this false impression irreparably harms him and his new company, The Field. Furthermore, the Court believes that granting preliminary injunctive relief "will advance the public interest because it will remove a false endorsement from the market and prevent customers from mistakenly believing that Mr. Powell is personally endorsing and participating in the design of" JL Powell Clothing LLC's products. Counterpl.'s Mot. for Prelim. Inj. 20. While JL Powell LLC likely has the right to use the Defendant's

endorsement, the same cannot be said for JL Powell Clothing LLC. Presumably the Plaintiff changed its corporate form from JL Powell LLC to JL Powell Clothing LLC for good reasons. It cannot now have its cake and eat it too. JL Powell Clothing LLC is the entity operating the business and publishing the catalog. It cannot exceed the limits of its legal rights by claiming the unassigned rights of its predecessor as its own. The balance of equities tips in favor of granting injunctive relief.

### F. Whether the Defendant Infringed the "The Sporting Life" Trademark

The Plaintiffs also request injunctive relief for alleged infringement of the "J.L. Powell" and "The Sporting Life" trademarks. Because the Plaintiffs have already established their right to enjoin the Defendant from using his name, any injunctive relief for infringing the "J.L. Powell" trademark would be redundant. But JL Powell Clothing LLC also owns the mark, "The Sporting Life."[21] The Plaintiffs argue that the Defendant's use of that mark constitutes federal trademark infringement and request an order enjoining the Defendant from using "The Sporting Life."[22]

Section 32(1) of the Lanham Act governs claims for infringement of registered marks. It provides:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

---

[21]     *See* footnote 15, *supra*, and Pls. Ex. 47 (federal trademark registration of "The Sporting Life").
[22]     *See* Am. Compl. at ¶¶ 69, 73-74 and Pls.' Reply at 7.

> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a). [23]

The First Circuit has repeatedly held that:

> "Trademark law seeks to prevent one seller from using the same 'mark' as – or one similar to – that used by another in such a way that he confuses the public about who really produced the goods . . . ."

*Equine Technologies, Inc. v. Equitechnology, Inc.* 68 F.3d 542, 544 (1st Cir. 1995) (quoting *DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir. 1992)). To establish trademark infringement, a plaintiff must show "that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir. 1996). The First Circuit uses an eight factor test to determine whether there is a likelihood of confusion. These factors, sometimes referred to as the "*Pignons* factors," are:

> (1) the similarity of the marks, (2) the similarity of the goods, (3) the relationship between the parties' channels of trade, (4) the relationship between the parties' advertising, (5) the classes of prospective purchasers, (6) the evidence of actual confusion, (7) the defendant's intent in adopting the mark and (8) the strength of the plaintiff's mark.

---

[23]    The Amended Complaint contains claims sounding in federal trademark law under both Section 32(1) and Section 43 of the Lanham Act, which covers claims for unregistered marks, unfair competition, and dilution. 15 U.S.C. §§ 1125(a)(1)(A) & (c). Plaintiffs also assert causes of action under the Maine Deceptive Trade Practices Act, 10 M.R.S.A. § 1121 *et seq.* and the Maine Anti-Dilution Statute, 10 M.R.S.A. § 1530.

*Swarovski Aktiengesellschaft v. Building No. 19, Inc.,* 704 F.3d 44, 49 n.2 (1st Cir. 2013) (citing *Pignons S.A. Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487-91 (1st Cir. 1981)).

At the hearing on the motion for preliminary injunction, Bruce Willard identified a document, which he described as a screen shot taken from thefieldoutfitting.com. Willard testified that the screen would not generally be visible to consumers but would be visible to someone clicking on the properties of the name. Tr. at 154-157. The document contains what appear to be strings of code and words, including the following:

> <meta name = "keywords" content = "JL Powell, Luxury menswear, men&#39;s fashion, women&#39;s fashion, leather luggage, travel clothing, safari clothing, made in usa, rancourt shoes, field shoes, field boots, footwear, powell clothing, powell field, luxury travel, luxury gifts, field catalog, field book, travel catalog, rainer andreeson, *the sporting life*, luxury lifestyle, The Passion to Explore" />

Pls.' Ex. 56 (emphasis added).

Very generally speaking, meta-tags are part of a website's HTML code that describe the website to a search engine. A website's HTML code is not something that appears on the face of the website. Meta-tags can be important in trademark cases because a website's meta-tags tell a search engine when that website should be included in the search engine's results. So if a person searches for "the sporting life" on an internet search engine, websites with the meta-tag "the sporting life" will appear in the results generated by the search engine. A company can include its competitor's trademark or trade name in its meta-tags in such a way that when a potential customer enters that competitor's trademark or trade name into their

search engine, expecting to get the competitor's website, their results will not only include the misusing company's website, but may list the misusing company's website first. *See generally* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:69 (4th ed. 2013).

In *Venture Tape Corp. v. McGills Glass Warehouse,* 540 F.3d 56 (1st Cir. 2008), McGills Glass Warehouse ("**McGills**"), one of Venture Tape Corp.'s ("**Venture Tape**") competitors in the stained glass industry, used Venture Tape's registered trademarks for its products "Venture Tape" and "Venture Foil" as meta-tags for McGills' website. The district court granted Venture Tape summary judgment on its Lanham Act unfair competition and trademark infringement claims. The First Circuit affirmed the district court even though there was no evidence that customers were actually lured to Venture Tape's website as a result of McGills' use of Venture Tape's trademarks in its website's meta-tags. The First Circuit explained that the Lanham Act requires only a likelihood of customer confusion, so the absence of evidence of actual confusion in the record was not fatal to Venture Tape, particularly because all of the *Pignons* factors were otherwise satisfied. *Id.* at 61-62. The district court found that as a result of McGills' use of the meta-tags, "internet search engines located McGills' website and prominently listed a link to it when internet users performed keyword searches including the terms 'Venture Tape' and/or 'Venture Foil.' Often, the link to McGills' website would appear before the link to Venture Tape's website . . . ." *Venture Tape Corp. v. McGills Glass Warehouse,* No. 03-CV-11045-MEL, at *3 (D. Mass. April 10, 2006).

The Plaintiffs have produced evidence that The Field's website included "the sporting life" and "JL Powell" in its meta-tags, Pls.' Ex. 56, but the Plaintiffs have produced no evidence that a search for "JL Powell" and/or "the sporting life" on a search engine will generate The Field's website among the results, much less that The Field website would appear above J.L. Powell's website. Had the Plaintiffs produced any evidence that the Defendant's use of "The Sporting Life" generated search results for thefieldoutfitting.com in proximity to results for J.L. Powell's website, injunctive relief might be appropriate.

But based on the evidentiary showing made to date, the Plaintiffs have not established that they are likely to succeed on their unfair competition and trademark infringement claims for the Defendant's use of the registered trademark "The Sporting Life" and are therefore not entitled to preliminary relief on the Defendant's use of that trademark.

## CONCLUSION

For the above-stated reasons, the Plaintiffs' motion for preliminary injunction is **GRANTED IN PART** and **DENIED IN PART**. The Defendant is hereby **PRELIMINARILY ENJOINED** from using his name or endorsement in connection with his business venture The Field, and is directed to instruct other persons or entities using his name or endorsement in connection with the Field to cease any such use. The Defendant's motion to supplement the record is **GRANTED**, and the Defendant's motion for injunctive relief is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff JL Powell Clothing LLC is hereby

**PRELIMINARILY ENJOINED** from using the Defendant's signature in connection with its business.

**SO ORDERED.**

Dated this 30th day of January, 2014.

/s/ Nancy Torresen
United States District Judge